Stephanie R. Tatar – State Bar No. 237792
**TATAR LAW FIRM, APC**
3500 West Olive Avenue
Suite 300
Burbank, California 91505
Tel. (323) 744-1146
Fax. (888) 778-5695
Stephanie@thetatarlawfirm.com

*Attorneys for Plaintiffs
and the proposed Class*

*Additional attorneys on signature page*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHOSHA KELLMAN and ABIGAIL STARR, on behalf of themselves and all others similarly situated, | Case No. 4:17-cv-6584 |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| WHOLE FOODS MARKET, INC., | |
| Defendant. | |

1

CLASS ACTION COMPLAINT

Plaintiffs Shosha Kellman and Abigail Starr, by their attorneys, bring this class action against Whole Foods Market, Inc. ("WF"), on their own behalf and on behalf of all others similarly situated, and allege as follows:

## I.   **INTRODUCTION**

1.      Whether an annoying patch of dry skin or an oozing rash that affects one's social life, as much as 70% of the U.S. population is allergic to at least one personal care product ingredient. Most of these skin allergies are of unknown cause.

2.      It is extremely difficult for people to identify what ingredient they are allergic to. Allergic reactions are attenuated in both space and time. Some allergic reactions will not manifest until a week after exposure to the allergen.  Even worse – some allergic reactions will not manifest on the body part exposed to the allergen.  Instead, the immune system will sometimes "remember" the first exposure and the allergic reaction will develop on the body part that was *first* exposed to the allergen.

3.      Thus, consumers increasingly seek hypoallergenic products.  Those who do not suffer from skin allergies seek hypoallergenic products to avoid developing a skin allergy.  Those who do suffer from a skin allergy seek hypoallergenic products to avoid the inflammatory cascade caused by an unidentified skin allergen.

4.      Since its founding, WF bases its brand as being a credible and trustworthy retailer, offering information and advice to consumers desiring safe products or seeking to avoid certain food ingredients or allergens.

5.      In an effort to lure more customers, WF expanded to become not only a retailer and educator, but also a manufacturer of household and body care products. These private labels include 365 Everyday Value and WF product lines.

6.      Seeking to capture the growing hypoallergenic market, WF prominently labels many of its products as "hypoallergenic."  *See* Product Labels attached as Exhibit 1.

7.      However, despite its marketing scheme, WF's products are chock-full of known

CLASS ACTION COMPLAINT

skin sensitizers (allergens), agents that cause serious skin damage, chemicals that cause serious eye damage lasting longer than 21 days, skin irritants, and eye irritants. Even more, WF's products also contain known carcinogens, mutagens, reproductive toxins, and other chemicals extremely hazardous to human health. *See* Exhibit 1, ¶¶ 79-107, *infra*.

8.     This is a class action on behalf of a national class of consumers who purchased WF's body care products that were falsely and misleadingly marketed as "hypoallergenic." These products in fact contain a shocking array of compounds known to cause allergic responses. These products also contain a plethora of other compounds known to cause severe skin corrosion, serious eye damage, or are otherwise toxic or hazardous in the case of skin contact. These products are also stuffed with other chemicals that have not been analyzed for their skin sensitization potential. Finally, these products also contain ingredients known to cause cancer, genetic mutations, birth defects, or are otherwise toxic or hazardous to human health or the environment.

9.     Many of the ingredients are permitted body care products.   Yet WF did not simply claim that its household products are "legal."  WF falsely and misleadingly claimed that the ingredients in its products are "hypoallergenic" when they are not.

10.     By deceiving consumers about the nature, quality, and/or ingredients of its products, WF is able to command a premium price, increasing consumers' willingness to pay and take away market share from competing products, thereby increasing its own sales and profits.

11.     Consumers lack the ability to test or independently ascertain the toxicity of a chemical, especially at the point of sale.  Reasonable consumers must and do rely on the chemicals company to honestly report the nature of the product's ingredients.

12.     WF further encouraged consumers to rely on its representations, marketing itself as an honest company that provides transparent and truthful information about its products' ingredients.

13.     WF intended for consumers to rely on its representations, and hundreds of thousands of reasonable consumers did in fact so rely.

CLASS ACTION COMPLAINT

14.     As a result of its false and misleading labeling, WF was able to sell these products to hundreds of thousands of consumers throughout the United States and to profit handsomely from these transactions.

15.     WF's false and misleading representations and omissions violate state and federal law, both civil and criminal, detailed more fully below, including California's Unfair Competition Law, California's Consumer Legal Remedies Act, New York's General Business Law, similar state statutes, and common law.

16.     Plaintiffs bring this action to stop WF's deceptive and misleading practices.

## II.     <u>JURISDICTION AND VENUE</u>

17.     This Court has personal jurisdiction over the parties in this case.  Plaintiff Kellman is a citizen of California.  Plaintiff Starr is a citizen of New York.

18.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).  Jurisdiction under CAFA is met because the proposed number of putative class members exceeds 100, at least one plaintiff and one defendant are citizens of different states, and the amount in controversy, including, but not limited to the aggregate amount of relief sought by absent class members, exclusive of interest and costs, exceeds $5 million.

19.     This Court has personal jurisdiction over WF because it is a corporation with sufficient minimum contacts in California or otherwise intentionally avails itself of the laws of this State through its marketing of the products at issue in California to consumers in California, through its direct sales of the products at issue in California to consumers in California, so as to render the exercise of jurisdiction by this Court consistent with traditional notions of fair play and substantial justice.

20.     Venue is proper in this District under 28 U.S.C. § 1391(a).  Substantial acts in furtherance of the alleged improper conduct, including the dissemination of false, misleading and deceptive information regarding the nature, quality, and/or ingredients of the products, occurred within this District.

CLASS ACTION COMPLAINT

21.     No other forum would be more convenient for the parties and witnesses to litigate this action.

### III.     PARTIES

22.     Plaintiff Shosha Kellman is an individual consumer who, at all times material hereto, was a citizen of the State of California and resident of Alameda.  For approximately twenty-four months, from early 2014 through early 2016, Plaintiff Kellman regularly purchased WF's 365 Gentle Skin Cleanser from the Whole Foods Market located at 3000 Telegraph Ave, Berkeley CA 94705 and from the Whole Foods Market located at 230 Bay Place, Oakland, CA 94612. Ms. Kellman consistently used a credit card for her purchases. Plaintiff Kellman estimates that she purchased the product every four to six weeks.  In addition, Plaintiff Kellman purchased other WF products.  Plaintiff Kellman sometimes purchased WF's 365 moisturizing lotion during the same 24-month period of time.

23.     In deciding to make these purchases, Plaintiff Kellman saw, relied upon, and reasonably believed the label representation that the products were "hypoallergenic." These representations were a significant reason for her purchases.

24.     Plaintiff Kellman and her family members have all suffered skin irritation, eye irritation, dermatitis, and/or an allergic skin reaction in the past.

25.     In the case of common skin irritation or dermatitis, Plaintiff Kellman, like similarly situated consumers, is unsure whether what seemed like skin or eye irritation or dermatitis was in fact an allergic response to an ingredient in a personal care product.

26.     Like similarly situated consumers, Plaintiff Kellman does not know the identity of every ingredient she and her family are allergic to. Moreover, like similarly situated consumers, Plaintiff Kellman does not know which ingredients she or her family may develop an allergy to.

27.     Had Plaintiff Kellman known at the time that these products were not hypoallergenic as promised, she would not have purchased these products.

28.     Had Plaintiff Kellman known at the time that these products contained irritating,

CLASS ACTION COMPLAINT

toxic, hazardous, or otherwise harmful chemicals, she would not have purchased these products.

29.     Plaintiff Kellman purchased, purchased more of, or paid more for, these products than she would have had she known that the products contained skin sensitizers, irritants, toxins, carcinogens, or otherwise harmful chemicals.

30.     If WF's products were reformulated such that its representations were truthful, Plaintiff Kellman would consider purchasing WF's products in the future.

31.     The products that Plaintiff Kellman purchased are substantially similar to WF's other products alleged to be falsely labeled.

32.     Plaintiff Abigail Starr is an individual consumer who, at all times material hereto, was a citizen of the State of New York and resident of Manhattan.  During the class period, Plaintiff Starr regularly purchased WF's 365 Moisturizing Lotion.  She purchased these products in Manhattan at the Union Square (4 Union Square South, New York, NY 10003) and/or Houston Street (95 E. Houston St, New York, NY 10002) locations.  She consistently uses her debit card for all Whole Foods transactions.  In addition, Plaintiff Starr purchased other WF products.  On multiple occasions during the class period, Ms. Starr purchased WF's 365 Bubble Bath, WF's 365 Facial Tissue, and 365 Paper Towels.

33.     In deciding to make these purchases, Plaintiff Starr saw, relied upon, and reasonably believed the label representation that the products were "hypoallergenic."  These representations were a significant reason for her purchases.

34.     Plaintiff Starr and her family members have all suffered skin irritation, eye irritation, dermatitis, and/or an allergic skin reaction in the past.

35.     In the case of common skin irritation or dermatitis, Plaintiff Starr, like similarly situated consumers, is unsure whether what seemed like skin or eye irritation or dermatitis was in fact an allergic response to an ingredient in a personal care product.

36.     Like similarly situated consumers, Plaintiff Starr does not know the identity of every ingredient she and her family are allergic to.  Moreover, like similarly situated consumers,

CLASS ACTION COMPLAINT

Plaintiff Starr does not know which ingredients she or her family may develop an allergy to.

37.     Had Plaintiff Starr known at the time that these products were not hypoallergenic as promised, she would not have purchased these products.

38.     Had Plaintiff Starr known at the time that these products contained irritating, toxic, hazardous, or otherwise harmful chemicals, she would not have purchased these products.

39.     Plaintiff Starr purchased, purchased more of, or paid more for, these products than she would have had she known that the products contained skin sensitizers, irritants, toxins, carcinogens, or otherwise harmful chemicals.

40.     If WF's products were reformulated such that its representations were truthful, Plaintiff Starr would consider purchasing WF's products in the future.

41.     The products that Plaintiff Starr purchased are substantially similar to WF's other products alleged to be falsely labeled.

42.     Defendant Whole Foods Market, Inc. is a corporation with its principal place of business located at 550 Bowie Street, Austin, Texas. WF manufactures and/or causes the manufacture of personal care and baby care products.  WF labels these products under its own name, and markets and distributes the products nationwide through its corporate parent's online website (amazon.com) and through its retail stores located throughout the United States.  WF has 85 stores in the State of California and 17 stores in the State of New York. 2016 Whole Foods Annual Report at 14.

## IV.     FACTUAL ALLEGATIONS

**A.     Consumers Actively Seek Hypoallergenic Body Care Products**

43.     According to the Centers for Disease Control and Prevention ("CDC"), 8.8 million children (12% of U.S. children) reported skin allergies in 2012. Skin allergies are even more prevalent among young children; CDC reports that 14.2% of children between the ages of 0 and 4 suffered a skin allergy in 2012.

44.     These numbers are likely to underreport the prevalence of allergic contact

CLASS ACTION COMPLAINT

dermatitis; recent studies show that somewhere between 14-70% of children suffer from skin allergies, based on positive patch skin tests.

45.     Skin allergies are similarly prevalent among adults.

46.     When skin is exposed to a sufficient amount of a chemical allergen, the skin is "sensitized." Upon re-exposure to the allergen, the skin initiates an inflammatory cascade, causing skin changes associated with allergic contact dermatitis. These include redness, oedema (fluid retention), scaling, fissures (cracking), vesicles (fluid-filled sacs), bullae (bubble-like cavity), and eventually oozing.

47.     Contact sensitization and related skin allergies can severely affect a person's quality of life, depending on the severity and the site of skin sensitization.  People suffering from noticeable skin allergies will try to hide the symptoms under clothing if possible, and if not, will avoid public spaces entirely.  In either case, skin allergies can dramatically affect a person's confidence and engagement in life.

48.     It is difficult to identify the substance causing an allergic response.  Allergic contact dermatitis develops several days after exposure to a skin allergen.  Some substances do not cause symptoms until a week after exposure.

49.     Even more, once an individual is sensitized to an allergen, future contact with the allergen can trigger a response in the *original* site of sensitization. For example, if someone had an allergic response to a product used on the face, and later used a different product containing the same allergen on the legs, the allergic response will occur again on the *face* – even if the face was never exposed to the second product.

50.     When a consumer cannot identify the material to which they are allergic, allergic contact dermatitis will persist, and, it is believed, will take longer to resolve even after the cause is identified.

51.      Thus, consumers will actively seek out hypoallergenic products – to avoid a skin allergy from occurring at all and/or to prevent a known skin allergy from repeating the

CLASS ACTION COMPLAINT

inflammatory cascade.

**B.**  **Definition of Hypoallergenic**

52.     The scientific and regulatory definition of a skin sensitizer is a substance that causes sensitization by skin contact in a substantial number of persons based on human evidence or appropriate animal testing.

53.     If a skin sensitizer makes up 0.1% or more of a product, or if the product contains a sensitizer that may elicit an allergic response at concentrations smaller than 0.1% in individuals who are already sensitized to the chemical, the *entire* product mixture is classified as a skin sensitizer, *i.e.,* the product causes sensitization by skin contact in a substantial number of persons based on human evidence or appropriate animal testing.

54.     A product that is a skin sensitizer is not hypoallergenic.

55.     Consumers believe and expect that a product that is labeled as hypoallergenic does not contain skin sensitizers at a concentration that could elicit an allergic response in sensitized individuals.

56.      Once skin is sensitized, even a *minute* amount of the chemical allergen is enough to cause a full-blown allergic response.  Thus, consumers seeking hypoallergenic products also commonly expect that the product does not contain *any* skin sensitizers.

57.     All WF's products contain substances classified by reputable authorities as skin sensitizers.  *See infra* at ¶¶ 79-107 (identifying skin sensitizers) and Exhibit 1 (showing which products contain these skin sensitizers).

58.     All WF's products also contain skin sensitizers that are either present in Def's products at concentrations larger than 0.1%, or that may elicit an allergic response at concentrations smaller than 0.1% in sensitized individuals.

59.     Thus, WF's products are not hypoallergenic.

60.     Thus, WF's on-the-label promise that its products are "hypoallergenic" is false.

61.     Consumers also believe and expect that a hypoallergenic product will not cause

**CLASS ACTION COMPLAINT**

skin irritation, skin corrosion, or eye damage when used as directed.

62.     Consumers also believe and expect that a product that is labeled as hypoallergenic does not contain a significant amount of ingredients known to produce skin irritation, skin corrosion, and/or eye damage.

63.     WF's products contain significant amounts of ingredients classified by reputable authorities as causing skin irritation, skin corrosion, and/or eye damage.  *See infra* at ¶¶ 79-107 and Exhibit 1 (showing which products contain these ingredients).

64.     Thus, WF's on-the-label promise that its products are "hypoallergenic" is *also* misleading.

65.     WF knows how consumers understand "hypoallergenic," and encourages this understanding.

66.     Because even a *minute* amount of a chemical allergen is enough to cause a full-blown allergic response, consumers reasonably expect and believe that when a product is labeled as "hypoallergenic," this representation is true not just for the final formulation, but to every ingredient in the product.

67.     WF knows and encourages this understanding.

68.     WF knows that consumers rely upon it to not only test the final product formulation for basic safety, but to select only those ingredients that it considers to be safe.

69.     Advertising itself as "America's Healthiest Grocery Store," *see* Exhibit 2 (Google ad); 2016 Annual Report at 1, Whole Foods promises its customers that it "maintain[s] the strictest quality standards in the industry."  Exhibit 3 ("Company Info").

70.     Listing its "quality standards," Whole Foods identifies as its top standard: "We carefully evaluate each and every product we sell."  Exhibit 4 ("Quality Standards").

71.     WF stresses not only product safety, but *ingredient* safety.  As WF explains:

**OUR BODY CARE QUALITY STANDARDS**

We carry the finest, high-quality beauty, hair and body care products available

CLASS ACTION COMPLAINT

because we believe the quality of the items and ingredients you put on your body is as important as the foods and nutritional supplements you put in your body. We evaluate the quality of personal care products in terms of ingredients, experience, and efficacy.

Exhibit 5 ("Body Care Quality Standards").

72.     However, many ingredients in WF's products have not been adequately studied for safety.  Moreover, very few have been assessed for their sensitization potential.  *See* ¶¶ 79-107, *infra*.

**C.     WF's False Representations**

73.     On the products' labels, and again on its retail website, WF represents that certain of its products are "hypoallergenic." These products, (collectively, the "Falsely Labeled Products") are all falsely labeled, as all of these products contain skin sensitizers, skin irritants, eye irritants, and other deleterious compounds.

74.     These products are:

> 365 Baby Foaming Wash
> 365 Baby Lotion
> 365 Baby Shampoo
> 365 Bubble Bath
> 365 Gentle Skin Cleanser
> 365 Kids' Foaming Wash
> 365 Maximum Moisture Body Lotion
> 365 Moisturizing Lotion
> Whole Foods Market Baby Laundry Detergent
> Whole Foods Market Organic Laundry Detergent
> Wild Kratts Bubble Bath
> Wild Kratts Kids Foaming Body Wash

75.     The labels of these products are attached as Exhibit 1.

76.     Further encouraging consumers' reliance on WF's "hypoallergenic" promise, WF labels only *some* products as hypoallergenic, giving consumers the (false) impression that WF carefully reviewed each ingredient in its products to ensure that the "hypoallergenic" promise was made for only those products that truly are hypoallergenic.  *See, e.g.,* Exhibit 6.

77.     Yet, contrary to WF's promise, *all* these products in fact contain known skin

sensitizers.  They also ***all*** contain known skin or eye irritants, carcinogens, teratogens, mutagens, or pollutants.  Finally, they ***all*** contain substances that have not been adequately assessed for safety or skin sensitization potential.

78.     All WF's Falsely Labeled Products contain one or more of the following chemicals.

79.     ***Acacia senegal (organic gum arabic)*** is classified as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons. It is known to cause local contact dermatitis.  It is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days.  It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.

80.     Some testing classifies ***calendula officinalis flower extract*** as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons. It is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days.  It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.

81.     ***Caprylyl glycol*** causes Category 1 eye damage, i.e., it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.

82.     ***Cetearyl alcohol*** is recognized as an allergen by the American Contact Dermatitis Society.  Its safety for use in bodycare products has not been adequately assessed.  The limited testing done, however, shows it to be a skin irritant and eye irritant, causing skin damage in less than four hours and adverse effects on the cornea, iris, conjunctiva. It is inherently toxic to aquatic life.  It is also toxic to the mucous membranes, and is hazardous by definition under federal law.

83.     ***Cetyl alcohol*** has caused urticaria-like dermatitis in humans. It is also a skin and eye irritant.  It is also classified as an eye irritant, and it is inherently toxic to aquatic life with long-lasting effects.

84.     While ***citric acid*** is a common food ingredient, skin contact is known to cause allergic reactions in humans. It has been reported to cause Category 1B skin corrosion, meaning that it irreversibly damages the skin after short exposure; in animal tests, the substance caused visible necrosis after less than 1 hour of exposure. Corrosive reactions are typified by ulcers, bleeding, bloody scabs, and, by the end of observation at 14 days, by discoloration due to blanching of the skin, complete areas of alopecia, and scars. It causes Category 1 eye damage, i.e., it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.

85.     Repeated use of ***cocamidopropyl hydroxysultaine*** has caused increased skin irritation.  In one test on human subjects, while no skin irritation was observed at the first application of a 2.5% solution of cocamidopropyl hydroxysultaine, repeated applications caused slight to moderate skin irritation in 45% of the subjects, with 5% of the subjects developing strong irritation.   It causes Category 1 eye damage, i.e., it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.

86.     ***Decyl glucoside*** has caused sensitization in human testing and is recognized as an allergen by the American Contact Dermatitis Society.  It causes Category 1C skin corrosion, meaning that it irreversibly damages the skin after short exposure; in animal tests, the substance caused visible necrosis after less than 4 hours of exposure. Corrosive reactions are typified by ulcers, bleeding, bloody scabs, and, by the end of observation at 14 days, by discoloration due to blanching of the skin, complete areas of alopecia, and scars.  It causes Category 1 eye damage, i.e., it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.

87.     The sensitization potential of ***gluconolactone*** has not been assessed by any

reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a likely skin sensitizer.

88.     **Glycerin (also listed as "organic glycerin")** is known to cause eczema in humans. Based on its chemical structure and similarity to other known skin sensitizers, it is a suspected skin sensitizer. Glycerin (also listed as "organic glycerin") is classified as a skin and eye irritant. It is a mutagen, meaning that it is suspected of mutating human cells in a way that can be transmitted to children conceived after exposure.

89.     **Glyceryl stearate** is a skin and eye irritant. In animal testing (rabbits), it caused erythema, edema, atonia, desquamation, and/or fissuring.  It is also inherently toxic to aquatic life.

90.     **Isopropyl palmitate** is classified as a skin and eye irritant. Moreover, it is an ester, a class of chemicals known to be environmentally toxic.

91.     Some testing classifies **mentha viridis (spearmint) leaf oil** as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons. Mentha viridis (spearmint) leaf oil is classified as a fragrance allergen in the European Union.  It is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days.  It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.

92.     WF does not disclose the identity of the fragrances it uses, listing only the generic term "**natural fragrance**" on its product label.  Many synthetic fragrances are known to be human sensitizers, toxins and environmental hazards, and are associated with adverse reproductive effects, genetic mutations, and other ill effects.  As WF itself recognizes, "[p]hthalates have been linked to cancer and endocrine system disruption and are currently covered under the umbrella term "fragrance" in conventional products."  Exhibit 7 ("What You Won't Find in Our Cleaning Products").

93.     *Olea europaea (olive) oil* is classified as a skin irritant. (Thus, masseurs are discouraged from the external use of olive oil).  It is also classified as an eye irritant.

94.     The sensitization potential of *panthenol* has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is a likely skin sensitizer. In fact, it has produced allergic responses in some past testing on humans.  Panthenol is classified as a skin and eye irritant.

95.     *Phenoxyethanol* is a skin and severe eye irritant. It has induced an allergic response in both human and animal testing. It is recognized as an allergen by the American Contact Dermatitis Society. It is toxic by all routes (inhalation, ingestion, and dermal contact). It is extremely hazardous in case of eye contact and very hazardous in case of skin contact (defatting the skin and causing skin inflammation characterized by itching, scaling, reddening, or, occasionally, blistering).  Even short exposure can cause serious temporary or residual injury. It is toxic to the kidneys, the nervous system, and the liver, adversely affecting the central nervous system and peripheral nervous system, causing headaches, tremors, and central nervous system depression. It degrades into substances that are even more toxic.  It is a germ cell mutagen, suspected of mutating human cells in a way that can be transmitted to children conceived after exposure.  It is also a reproductive toxin, suspected of damaging fertility or the unborn child based on human or animal evidence. Phenoxyethanol is an ethylene glycol ether, which is known to cause wasting of the testicles, reproductive changes, infertility, and changes to kidney function. Phenoxyethanol is also carcinogen, meaning that it is suspected to induce cancer or increase its incidence.  Case studies indicate that repeated exposure to phenoxyethanol results in acute neurotoxic effects, as well as chronic solvent-induced brain syndrome, constant irritability, impaired memory, depression, alcohol intolerance, episodes of tachycardia and dyspnea, and problems with balance and rash.  Phenoxyethanol is also toxic by definition under federal law, and is regulated as a toxic compound.  Its use is restricted in Europe.

96.     *Polysorbate 20* is classified as a Category 1 skin sensitizer, based on multiple

CLASS ACTION COMPLAINT

positive tests demonstrating that repeated skin contact can be expected to cause allergic response in a substantial number of persons. It is also a Category 2 skin and eye irritant, causing skin damage in less than four hours and adverse effects on the cornea, iris, and conjunctiva.   It is made in part with ethylene oxide, resulting in 1.4 dioxane as a trace contaminant, which is classified as a possible carcinogen. It is a teratogen, meaning that it causes birth defects.

97.   **Polysorbate 60** has caused urticaria (hives and swelling) on human subjects' foreheads.   In animal testing, polysorbate 60 is a skin irritant.

98.   The sensitization potential of **potassium sorbate** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a likely skin sensitizer. Some case studies show it to cause contact urticaria.   It is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days. Some studies show it to cause Category 1A skin corrosion, meaning that it irreversibly damages the skin after short exposure; in animal tests, the substance caused visible necrosis after less than 3 minutes of exposure. Corrosive reactions are typified by ulcers, bleeding, bloody scabs, and, by the end of observation at 14 days, by discoloration due to blanching of the skin, complete areas of alopecia, and scars.   It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.  It is also a suspected mutagen.

99.   Some testing classifies **sodium benzoate** as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons.  It is also a skin irritant and causes serious eye damage.   It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva. Some testing finds that it causes Category 1 eye damage, i.e., it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.  It is a teratogen, meaning that it causes birth defects. Its use in personal care products

is limited in Europe.

100.   **Sodium bicarbonate** is classified as a skin and eye irritant. Some tests show that it causes Category 1 eye damage, i.e., it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.  It is a teratogen, meaning that it causes birth defects.

101.   **Sodium carbonate** is a skin and eye irritant. It causes Category 1 eye damage, i.e., it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.

102.   The sensitization potential of **sodium citrate** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a suspected skin sensitizer.  It is also classified as a skin and eye irritant, causing significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days, and causing adverse effects on the cornea, iris, and conjunctiva.

103.   The sensitization potential of **sodium myristoyl sarcosinate** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a suspected skin sensitizer.  It is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days.  It causes Category 1 eye damage, i.e., it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.

104.   The sensitization potential of **sodium oleate** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a suspected skin sensitizer.

105.   Though **xanthan gum** is safe as a food ingredient, it is not so safe for the

skin.  Some testing indicates that it is a skin sensitizer.  It is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days.  It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.

106.  ***Cyamopsis tetragonolobus gum (organic guar gum)*** is a contact sensitizer.  Additionally, it is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.

107.  ***Avena sativa (oat) kernel flour, or avena sativa kernel flour*** is classified as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons.

**D.    The Representations Are False, Deceptive, And Misleading**

108.  WF's conduct deceived and/or was likely to deceive the public.  Consumers were deceived into believing that the Falsely Labeled Products were hypoallergenic, as labeled.

109.  All these representations were false, as explained *supra*.

110.  Consumers would not know the true nature of the ingredients merely by reading the ingredient label.  Its discovery requires investigation beyond the grocery store and knowledge of chemistry beyond that of the average reasonable consumer.

**E.    Location Of The Misrepresentations**

111.  WF made the above false, deceptive, and misleading misrepresentations and omissions on the package of the Falsely Labeled Products.  *See* Exhibit 1.

112.  WF repeated the above false, deceptive, and misleading misrepresentations and omissions on its online retail product page for the Falsely Labeled Products. *See* Exhibit 1.

113.  The misrepresentations and omissions were uniform and have actually been communicated to Plaintiffs and to each member of the Class at every point of purchase and

consumption.

**F.    WF's Deceptive And Misleading Omissions**

114.    WF deceptively and misleadingly conceals other material facts about the Falsely Labeled Products, including:

      a.    the true nature of the Falsely Labeled Products' ingredients;

      b.    the identity of the Falsely Labeled Products' ingredients;

      c.    that the Falsely Labeled Products contain sensitizers, irritants, toxins, carcinogens, pollutants, and/or otherwise hazardous substances;

      d.    the concentration of the sensitizers, irritants, toxins, carcinogens, pollutants, and/or otherwise hazardous substances in the Falsely Labeled Products;

      e.    that the Falsely Labeled Products are not "hypoallergenic";

      f.    that the Falsely Labeled Products are not what a reasonable consumer would consider to be "hypoallergenic;"

      g.    that the Falsely Labeled Products contain chemicals that a reasonable consumer would not expect in a product labeled as "hypoallergenic."

115.    Plaintiffs and the members of the Class are not at fault for failing to discover WF's wrongs earlier, and had no actual or presumptive knowledge of facts sufficient to put them on inquiry notice.

116.    WF has concealed the identity of several ingredients. Discovery is therefore necessary to determine their identity.  These ingredients may also be sensitizers, irritants, or otherwise toxic.

117.    For example, WF adds "***fragrance***" or "***parfum***" to its products, but does not identify what chemical is used. Many ingredients used as fragrances are known skin sensitizers. Many are also extremely toxic to a person's skin, their overall health, and/or to the environment.

118.    WF also does not disclose the ingredients in the following products, though it labels them as "hypoallergenic:" 365 Diapers, 365 Sustainably Soft Bath Tissue, 365 Sustainably Soft

Facial Tissue, 365 Facial Tissue, 365 Paper Towels, 365 Training Pants. Exhibit 8. These products may also be included as "Falsely Labeled Products."

119.    Furthermore, WF has not disclosed the concentration of each ingredient in its products. Further investigation and discovery is needed so that Plaintiffs can ascertain whether entire products are also toxic.

120.    WF has also concealed from consumers the nature of its products' ingredients despite consumers' requests.  The possible carcinogenic, toxic, and environmental effects of its ingredients are still concealed from consumers today.

121.    These facts are not ascertainable and are still not known to Plaintiffs, the Class members, and reasonable consumers. WF's concealment tolls the applicable statute of limitations.

122.    To this day, WF continues to conceal and suppress the existence, true identity, nature, and concentration of the sensitizers, irritants, toxins, carcinogens, pollutants, and/or otherwise hazardous substances in the Falsely Labeled Products.

123.    Similarly, to this day, WF continues to conceal and suppress the fact that the Falsely Labeled Products are not "hypoallergenic" as promised.

124.    WF represents elsewhere on the product label and on its website that the products are "non-toxic," "safe," having "only the gentlest ingredients," and/or causing "no tears," etc. Exhibit 1. This further obscures the fact that WF's products are not hypoallergenic.

125.    For example, in its "Official Whole Foods Market Blog," WF encourages consumers seeking to avoid allergens in cleaning products to purchase Whole Foods Market brand products, as they lack the ingredients WF identifies in its in-house list of banned "unacceptable ingredients" for body care, premium body care, and household cleaners. *See, e.g.,* Exhibit 7 ("What You Won't Find in our Cleaning Products").

126.    WF fails to disclose, however, that many ingredients in its products are known skin allergens, even though they are not banned by WF's list of "unacceptable ingredients."

CLASS ACTION COMPLAINT

**G.     WF Knew Its Representations Were False**

127.     WF holds itself out to the public as trusted experts in the area of hypoallergenic, safe, mild, and gentle personal care products.

128.     WF knew what representations it made regarding the Falsely Labeled Products, as all representations appear on the products' packages.

129.     WF also knew what ingredients were added to each product, as (presumably) all product ingredients listed on the product packages and are further disseminated on their websites.

130.     WF is governed by and thus is presumed to know the federal regulations and state laws that control the labeling of the Falsely Labeled Products, and thus is aware that many of the ingredients have been federally declared to be chemical compounds that require inventory reporting under the Toxic Substance Control Act, are hazardous or toxic compounds that require special disclosures on safety data sheets, or are carcinogens or reproductive toxins that require product label warnings under state law.

131.     WF thus knew all the facts demonstrating that its Falsely Labeled Products contain sensitizers, irritants, and otherwise toxic ingredients, and that these products were therefore falsely labeled.

**H.     WF Intended Consumers To Rely**

132.     As WF knows, consumers prefer hypoallergenic products. As WF knows, consumers will pay a premium for hypoallergenic products or would not purchase these products at all unless they were hypoallergenic, as advertised.

133.     WF encourages consumers' preference for hypoallergenic products – specifically for WF's products – explaining to consumers that "we believe the quality of the items and ingredients you put on your body is as important as the foods and nutritional supplements you put in your body." Exhibit 5 ("Body Care Quality Standards").

134.     WF's misleading affirmative statements (e.g., that the products were mild, gentle, safe, caused "no more tears," or were environmentally safe) further obscured what WF failed to

disclose. Thus, reliance upon WF's misleading and deceptive representations and omissions may be presumed.

135. WF made the false, deceptive, and misleading representations and omissions, intending Plaintiffs and Class members to rely upon these representations and omissions in purchasing and using one or more Falsely Labeled Products.

136. In making the false, misleading, and deceptive representations and omissions at issue, WF knew and intended that consumers would purchase the WF products when consumers would otherwise purchase a competing product or employ an alternate regimen (such as using an oil for moisturizing).

137. In making the false, misleading, and deceptive representations and omissions at issue, WF also knew and intended that consumers would pay a premium for hypoallergenic products, furthering WF's private interest of increasing sales of its products and decreasing the sales of products marketed by its competitors.

## I.   **Consumers Reasonably Relied**

138. Consumers frequently rely on ingredient representations and information in making purchase decisions, especially in purchasing personal care products.

139. When Plaintiffs and the Class members purchased the Falsely Labeled Products, Plaintiffs and the Class members saw the false, misleading, and deceptive representations detailed above, and did not receive disclosure of the facts concealed, as detailed above.

140. These misrepresentations were uniform and were communicated to Plaintiffs and every other member of the Class at every point of purchase and consumption.

141. Plaintiffs and the Class members were among the intended recipients of WF's deceptive representations and omissions.

142. Plaintiffs and the Class members reasonably relied to their detriment on WF's misleading representations and omissions.

143. WF's false, misleading, and deceptive misrepresentations and omissions deceived

and misled, and are likely to continue to deceive and mislead, Plaintiffs, the Class members, reasonable consumers, and the general public.

144.    WF's misleading affirmative statements further obscured what it failed to disclose. Thus, reliance upon WF's misleading and deceptive representations and omissions may be presumed.

145.    WF made the deceptive representations and omissions with the intent to induce Plaintiffs and the Class members to purchase the Falsely Labeled Products.  Plaintiffs' and the Class members' reliance upon such representations and omissions may be presumed.

146.    WF's deceptive representations and omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.  Thus, Plaintiffs' and the Class members' reliance upon such representations and omissions may be presumed as a matter of law.  The materiality of those representations and omissions also establishes causation between WF's conduct and the injuries sustained by Plaintiffs and the Class members.

**J.    <u>WF's Wrongful Conduct Caused Plaintiffs' Injury</u>**

147.    As an immediate, direct, and proximate result of WF's false, misleading, and deceptive representations and omissions, WF injured Plaintiffs and the Class members in that they:

      a.    paid a sum of money for a product that was not as represented;

      b.    paid a premium price for a product that was not as represented;

      c.    were deprived the benefit of the bargain because the Falsely Labeled Products they purchased were different from what WF warranted;

      d.    were deprived the benefit of the bargain because the Falsely Labeled Products they purchased had less value than what was represented;

      e.    did not receive a product that measured up to their expectations as created by WF;

      f.    used (or caused their children to use) a substance that Plaintiffs and the

members of the Class did not expect or consent to;

g.      used (or caused their children to use) a product that was not hypoallergenic;

h.      without their knowing consent, used (or caused their children to use) a substance that is generally harmful to their health or their children's health;

i.      without their knowing consent, used (or caused their children to use) a substance that is a skin sensitizer, irritant, or a known or suspected toxin, carcinogen, mutagen, teratogen, environmental pollutant, or otherwise is harmful to the environment and/or their health.

148.    Had WF not made the false, misleading, and deceptive representations and omissions, Plaintiffs and the Class members would not have been injured as listed above. Accordingly, Plaintiffs and the Class members have suffered injury in fact as a result of WF's wrongful conduct.

149.    Plaintiffs and the Class members all paid money for the Falsely Labeled Products, but did not obtain the full value of the advertised products due to WF's misrepresentations and omissions. Plaintiffs and the Class members purchased, purchased more of, or paid more for, the Falsely Labeled Products than they would have had they known the truth about the Falsely Labeled Products. Accordingly, Plaintiffs and the Class members have suffered injury in fact and lost money or property as a result of WF's wrongful conduct.

**K.    WF Benefitted From Its Misleading And Deceptive Representations And Omissions**

150.    As the intended, direct, and proximate result of WF's false, misleading, and deceptive representations and omissions, WF has been unjustly enriched through more sales of Falsely Labeled Products and higher profits at the expense of Plaintiffs and the Class members. As a direct and proximate result of its deception, WF also unfairly obtained other benefits, including the higher value associated with a "hypoallergenic" brand and the resulting higher stock value, redirecting sales to it and away from its competitors, and increased sales of its other products.

CLASS ACTION COMPLAINT

1

## V.      CLASS ALLEGATIONS

2      151.   Plaintiffs Kellman and Starr bring this action pursuant to Rule 23 of the Federal

3  Rules of Civil Procedure on behalf of themselves and all other similarly situated United States

4  residents who purchased the Falsely Labeled Products (as defined herein).

5      152.   Plaintiff Kellman also brings this action on behalf of herself and all other similarly

6  situated California residents who purchased the Falsely Labeled Products (as defined herein) (the

7  "California Class").

8      153.   Plaintiff Starr also brings this action on behalf of herself and all other similarly

9  situated New York residents who purchased the Falsely Labeled Products (as defined herein) (the

10  "New York Class").

11      154.   Excluded from the Class are officers and directors of WF; members of the

12  immediate families of the officers and directors of WF; WF's legal representatives, heirs,

13  successors, or assigns; and any entity in which they have or have had a controlling interest.

14      155.   Plaintiffs bring each Class pursuant to Federal Rules of Civil Procedure 23(a),

15  23(b)(1), 23(b)(2), and 23(b)(3).

16      156.   At this time, Plaintiffs do not know the exact number of the Class members; given

17  the nature of the claims and the number of sales that WF has made of the Products, Plaintiffs

18  believe that members of each Class are so numerous that joinder of all members is impracticable.

19      157.   There is a well-defined community of interest in the questions of law and fact

20  involved in this case.  Questions of law and fact common to the members of the Class that

21  predominate over questions that may affect individual Class members include:

22           a.     whether WF misrepresented and/or failed to disclose material facts

23  concerning the Falsely Labeled Products;

24           b.     whether WF's conduct was unfair and/or deceptive; and

25           c.     whether WF breached an express warranty created through the labeling and

26  marketing of its Falsely Labeled Products.

27

CLASS ACTION COMPLAINT

158.   Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, purchased one or more of WF's Falsely Labeled Products at a premium price, relying on WF's false and misleading representations, and Plaintiffs sustained damages from WF's wrongful conduct.

159.   Plaintiffs will fairly and adequately protect the interests of the Class because Plaintiffs are similarly situated with, and have suffered similar injuries as, the members of the Class they seek to represent.  Plaintiffs feel that they have been deceived, wish to obtain redress of the wrong, and want WF to be stopped from perpetrating similar wrongs on others.  Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class members they seek to represent, and they have retained counsel competent and experienced in conducting complex class action litigation, who were the first to publicly uncover the true scope and extent of WF's wrongs.  Plaintiffs have no interests adverse to those of the Class members, and will vigorously prosecute this litigation.

160.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Specifically, no Class has a substantial interest in individually controlling the prosecution of a separate action.  The damages suffered by each individual Class member likely will be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by WF's conduct.  Thus, it would be virtually impossible for the Class members individually to redress effectively the wrongs done to them.

161.   The prerequisites to maintaining a class action for injunctive or equitable relief are met as WF has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

162.   Upon information and belief, there are no pending lawsuits concerning the products at issue in this case.  Concentration of the litigation concerning this matter in this Court is desirable, and the difficulties likely to be encountered in the management of a class action are not great.  The resolution of the claims of all Class members in a single forum, and in a single proceeding, would

be a fair and efficient means of resolving the issues raised in this litigation.

163.    The prosecution of separate actions by Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for WF.

164.    WF's conduct is generally applicable to the Class as a whole and Plaintiffs seek, *inter alia*, equitable remedies with respect to the Class as a whole.  As such, WF's systematic policies and practices make declaratory relief with respect to the Class as a whole appropriate.

165.    The Class is specifically identifiable to facilitate provision of adequate notice and there will be no significant problems managing this case as a class action.  Notice to the Class can be made through various means, such as in-store leaflets, website notices, Facebook notices, notices on the labels of the packages, and/or direct notice to those consumers for which WF knows the e-mail or physical mailing address.

## VI.   <u>CAUSES OF ACTION</u>

166.    The allegations in each Cause of Action are repeated and realleged in every other Cause of Action as if set forth in full therein.

### <u>COUNT 1</u>

### Breach of Express Warranty

### *On Behalf of the Nationwide Class and, in the alternative,*
### *the California Class and the New York Class*

167.    WF provided Plaintiffs and other members of the Class with written express warranties including, but not limited to, warranties that its Falsely Labeled Products were "hypoallergenic."

168.    These affirmations of fact or promises by WF relate to the goods and became part of the basis of the bargain.

169.    Plaintiffs and members of each Class purchased the Falsely Labeled Products, believing them to conform to the express warranties.

170.    WF breached these warranties.  This breach resulted in damages to Plaintiffs and

other members of the Class, who bought Falsely Labeled Products but did not receive the goods as warranted.

171.    As a proximate result of the breach of warranties by WF, Plaintiffs and the other members of the Class did not receive goods as warranted.  Plaintiffs and the members of the Class therefore have been injured and have suffered damages in an amount to be proven at trial.  Among other things, Plaintiffs and members of the Class did not receive the benefit of the bargain and have suffered other injuries as detailed above.  Moreover, had Plaintiffs and the Class members known the true facts, they would not have purchased the products, would have purchased fewer products, or would not have been willing to pay the premium price WF charged for the products.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT 2

### Unjust Enrichment

*On Behalf of the Nationwide Class and, in the alternative,*
*the California Class and the New York Class*

172.    As a result of WF's deceptive, fraudulent, and misleading labeling, advertising, marketing, and sales of the Falsely Labeled Products, WF was enriched at the expense of Plaintiffs and the other members of the Class through the payment of the purchase price for WF's Falsely Labeled Products.

173.    Under the circumstances, it would be against equity and good conscience to permit WF to retain the ill-gotten benefits that it received from Plaintiffs and the other members of the Class, in light of the fact that the Falsely Labeled Products purchased by Plaintiffs and the other members of the Class were not what WF purported them to be.  Thus, it would be unjust or inequitable for WF to retain the benefit without restitution to Plaintiffs and the other members of the Class for the monies paid to WF for such Falsely Labeled Products.

WHEREFORE, Plaintiffs pray for relief as set forth below.

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**COUNT 3**

**Unfair and Deceptive Acts and Practices**

***On Behalf of the Nationwide Class and, in the alternative, the California Class***

174.   This cause of action is brought pursuant to California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750-1785 (the "CLRA") and similar statutes.

175.   Plaintiffs and the other members of the Class are "consumers," as the term is defined by California Civil Code § 1761(d) and similar statutes, because they bought the Falsely Labeled Products for personal, family, or household purposes.  WF is a "person" under Cal. Civ. Code § 1761(c) and similar statutes.

176.   The Falsely Labeled Products are "goods" under Cal. Civ. Code § 1761(a) and similar statutes.   Plaintiffs, the other members of the Class, and WF have engaged in "transactions," as that term is defined by California Civil Code § 1761(e) and similar statutes. For the California Class, these transactions all occurred on in the State of California.

177.   The conduct alleged in this Complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purposes of the CLRA and similar statutes, and the conduct was undertaken by WF in transactions intended to result in, and which did result in, the sale of goods to consumers.

178.   WF's false and fraudulent representations and omissions have violated, and continue to violate the CLRA and similar statutes because they extend to transactions that are intended to result, or have resulted, in the sale of goods to consumers, including the Plaintiffs and the Class members.

179.   WF's conduct violates Cal. Civ. Code § 1770(a)(5) and similar statutes, which prohibits "[r]epresenting that goods . . . have . . . characteristics [or] ingredients . . . which they do not have," and Cal. Civ. Code § 1770(a)(7) and similar statutes, which prohibits: "[r]epresenting that goods  . . . are of a particular standard, quality, or grade . . . if they are of another," causing injury to Plaintiffs and the Class.

CLASS ACTION COMPLAINT

180.    As a result of engaging in such conduct, WF has violated California Civil Code § 1770(a)(5), (a)(7), and (a)(9) and similar statutes.

181.    Plaintiffs will serve WF with notice of its CLRA violations by certified mail, return receipt requested.  If, after the requisite thirty days of receiving notice, WF continues to refuse to correct its wrongs, Plaintiffs will amend this Complaint to include a claim for punitive damages for WF's CLRA violations.

182.    Plaintiffs and the Class members seek preliminary injunctive relief, and permanent injunctive relief against WF's unfair and deceptive acts and conduct.

183.    Pursuant to California Civil Code § 1780(a)(2) and (a)(5) and similar statutes, Plaintiffs seek an order of this Court that includes, but is not limited to, an order enjoining WF from continuing to engage in unlawful, unfair, or fraudulent business practices or any other act prohibited by law.

184.    Plaintiffs and the other Class members may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

185.    The unfair and deceptive acts and practices of WF, as described above, present a serious threat to Plaintiffs and the other members of the Class.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## <u>COUNT 4</u>

### Violations of California's False Advertising Law and Similar Statutes

### *On Behalf of the Nationwide Class and, in the alternative, the California Class*

186.    This cause of action is brought pursuant to California's False Advertising Law (the "FAL"), Cal. Bus. & Prof. Code § 17500 *et seq.* and similar statutes.

187.    Such acts of WF, as described above, and each of them constitute unlawful, deceptive, and fraudulent business acts and practices.

188.    At all material times, WF engaged in a scheme of offering the Falsely Labeled Products for sale to Plaintiffs and the other members of the Class by way of distributing within the

State of California (or the residence) to the public, *inter alia*, commercial marketing and advertising, the World Wide Web (Internet), Falsely Labeled Product packaging and labeling, and other promotional materials and offered for sale the Falsely Labeled Products on a nationwide basis, including in California.

189.    The misrepresentations and non-disclosures by WF of the material facts detailed above constitute false and misleading advertising, and therefore constitute a violation of Cal. Bus. & Prof. Code § 17500, *et seq*. and similar statutes.

190.    Said advertisements and inducements were made within the state of residence and come within the definition of advertising contained in the FAL in that such promotional materials were intended as inducements to purchase WF's Falsely Labeled Products and are statements disseminated by WF to Plaintiffs and the other Class members.  WF knew, or in the exercise of reasonable care should have known, that these representations were misleading and deceptive.

191.    Consumers, including Plaintiffs and the other Class members, necessarily and reasonably relied on these materials concerning WF's Falsely Labeled Products.  Consumers, including Plaintiffs and the Class members, were among the intended targets of such representations.

192.    The above acts of WF did and were likely to deceive reasonable consumers, including Plaintiffs and the other members of the Class, by obfuscating the nature, quality, and/or ingredients of the Falsely Labeled Products, in violation of the "misleading" prong of the FAL and similar statutes.

193.    The business practices alleged above are unlawful under the CLRA and similar statutes, which forbids misleading and deceptive advertising.

194.    Plaintiffs and the other members of the Class have suffered injury in fact and have lost money or property as a result of WF's violations of the FAL and similar statutes.

195.    As a result, WF has been unjustly enriched at the expense of Plaintiffs and the other members of the Class.  Plaintiffs and the Class, pursuant to California Business and Professions

CLASS ACTION COMPLAINT

Code § 17535 and similar statutes, are entitled to an order of this Court enjoining such future conduct on the part of WF, and such other orders and judgments which may be necessary to disgorge WF's ill-gotten gains and restore to any person in interest any money paid for its Falsely Labeled Products as a result of the wrongful conduct of WF.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## <u>COUNT 5</u>

### Violation of California's Unfair Competition Law and Similar Statutes

### *On Behalf of the Nationwide Class and, in the alternative, the California Class*

196.     This cause of action is brought pursuant to California's Unfair Competition Law (the "UCL"), Cal. Bus. & Prof. Code § 17200 *et seq*. and similar statutes.

197.     By committing the acts and practices alleged herein, WF has engaged in deceptive, unfair, and unlawful business practices in violation of the UCL and similar statutes.

198.     Plaintiffs have standing to pursue this claim as they have suffered injury in fact and have lost money or property as a result of WF's actions as set forth above.  Class members also have suffered injury in fact and have lost money or property as a result of WF's actions as set forth above.

199.     The violation of any law constitutes an "unlawful" business practice under Cal. Bus. & Prof. Code § 17200 and similar statutes.

200.     Each of WF's false representations alleged herein violates U.S.C. § 331; Cal. Civ. Code § 1709; Cal. Civ. Code § 1750 *et seq*.; and Cal. Bus. & Prof. Code § 17500 *et seq., and* similar statutes.

201.     WF has violated the UCL's proscription against engaging in unlawful conduct as a result of its violations of (i) the CLRA and similar statutes, as alleged above, and (ii) the FAL and similar statutes, as alleged above.

202.     In addition, WF has violated the UCL's proscription against engaging in unlawful conduct as a result of its violations of the Sherman Law, Cal. Health & Safety Code § 109875 *et*

CLASS ACTION COMPLAINT

*seq.*, and similar statutes, which forbid (1) misbranding of any cosmetic, *id.* at §§ 110398 and 111445, and (2) manufacturing, selling, delivering, holding, or offering for sale any cosmetic that is misbranded or delivering or proffering such for delivery.  Cal. Health & Safety Code §§ 110390, 110395, 110398, 110400, 110550, 110585, 110620, 110625, 110660, 110770, 110705, 110740, 110760, 110765, 110770, 111445, and 111450.

203.    The Sherman Law defines a "person" as "any individual, firm, partnership, trust, corporation, limited liability company, company, estate, public or private institution, association, organization, group, city, county, city and county, political subdivision of this state, other governmental agency within the state, and any representative, agent, or agency of any of the foregoing."  Cal. Health & Safety Code § 109995.  WF is a "person" within the meaning of the Sherman Law.

204.    As more fully described herein, WF's misleading marketing, advertising, packaging, and labeling of the Falsely Labeled Products is likely to deceive a reasonable consumer.  Indeed, Plaintiffs and the other Class members were unquestionably deceived regarding the characteristics of WF's Falsely Labeled Products, as WF's marketing, advertising, packaging, and labeling of the Falsely Labeled Products misrepresents and/or omits the true nature, quality, and/or ingredients of the Falsely Labeled Products.

205.    There is no benefit to consumers or competition from deceptively marketing and labeling products.  Indeed, the harm to consumers and competition is substantial.  Plaintiffs and the other members of the Class who purchased the Falsely Labeled Products suffered a substantial injury as alleged herein.

206.    Plaintiffs and the other members of the Class who purchased the Falsely Labeled Products had no way of reasonably knowing that the Falsely Labeled Products they purchased were not as marketed, advertised, packaged, and labeled.  Thus, they could not have reasonably avoided the injury each of them suffered.

207.    WF's acts and omissions alleged above constitute unfair business practices under

Cal. Bus. & Prof. Code § 17200 and similar statutes because the gravity of the consequences of WF's conduct as described above outweighs any justification, motive, or reason therefor, particularly considering the available legal alternatives which exist in the marketplace, and such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiffs and the other members of the Class.   WF's false and misleading representations and omissions also violate legislatively declared policy as they have violated numerous state and federal laws. Moreover, the gravity of the harm to Plaintiffs and Class members resulting from WF's conduct outweighs WF's legitimate reasons, justifications and/or motives for engaging in such deceptive acts and practices

208.   Each false and misleading representation and omission constitutes fraudulent business practices under Cal. Bus. & Prof. Code § 17200 and similar statutes because the representations and omissions were false.   Even if these representations were true, WF's representations and deceptive concealment were nonetheless fraudulent under the statute because they were misleading and were likely to and did deceive the reasonable consumer, including Plaintiffs and the Class members.

209.   WF's violations continue to this day.

210.   Pursuant to California Business and Professions Code § 17203 and similar statutes, Plaintiffs and the other members of the Class seek an order of this Court that includes, but is not limited to, an order enjoining such future conduct on the part of WF and such other orders and judgments which may be necessary to disgorge WF's ill-gotten gains and to restore to any person in interest any money paid for WF's Falsely Labeled Products as a result of the wrongful conduct of WF.

WHEREFORE, Plaintiffs pray for relief as set forth below.

CLASS ACTION COMPLAINT

## COUNT 6

### Violation of New York's General Business Law § 349 and Similar Statutes

### *On Behalf of the Nationwide Class and, in the alternative, the New York Class*

211.     This cause of action is brought pursuant to New York General Business Law § 349 on Plaintiffs' behalf and on behalf of the Class and New York Class.

212.     Such acts of WF, as described above, constitute unlawful, deceptive, and fraudulent business acts and practices.

213.     WF has violated, and continues to violate, § 349 of the New York General Business Law, which makes deceptive acts and practices unlawful. As a direct and proximate result of WF's violation of § 349, Plaintiffs and other members of the Class and New York Class have suffered damages in an amount to be determined at trial.

214.     Pursuant to New York General Business Law § 349, Plaintiffs seek an order of this Court that includes, but is not limited to, an order enjoining WF from continuing to engage in unlawful, unfair, or fraudulent business practices or any other act prohibited by law.

215.     Plaintiffs and the other members of the Class and New York Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

216.     The unfair and deceptive acts and practices of WF, as described above, present a serious threat to Plaintiffs and the other members of the Class and New York Class.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT 7

### Violation of New York's General Business Law § 350 and Similar Statutes

### *On Behalf of the Nationwide Class and, in the alternative, the New York Class*

217.     WF's acts constitute unlawful, deceptive, and fraudulent business acts and practices.

218.     WF's misleading marketing, advertising, packaging, and labeling of the Falsely Labeled Products is false advertising likely to deceive a reasonable consumer.  Indeed, Plaintiffs

CLASS ACTION COMPLAINT

and the other Class members were deceived regarding the characteristics of WF's Falsely Labeled Products, as WF's marketing, advertising, packaging, and labeling of the Falsely Labeled Products misrepresents and/or omits the true nature, quality, and/or ingredients of the Falsely Labeled Products.

219.   There is no benefit to consumers or competition from deceptively marketing and labeling products.  Indeed, the harm to consumers and competition is substantial.

220.   Plaintiffs and the other members of the Class who purchased the Falsely Labeled Products suffered a substantial injury as alleged herein.  Plaintiffs and the other members of the Class who purchased the Falsely Labeled Products had no way of reasonably knowing that the Falsely Labeled Products they purchased were not as marketed, advertised, packaged, and labeled. Thus, they could not have reasonably avoided the injury each of them suffered.

221.   WF has violated, and continues to violate, § 350 of the New York General Business Law, which makes false advertising unlawful.  As a direct and proximate result of WF's violation of § 350, Plaintiffs and other members of the Class have suffered damages in an amount to be determined at trial.  Had Plaintiffs and the Class members known the true facts, they would not have purchased the products, would have purchased fewer products, or would not have been willing to pay the premium price WF charged for the products.

222.   Pursuant to New York General Business Law § 350-e, Plaintiffs seek to recover their actual damages or $500, whichever is greater, and seek to have these damages trebled.

223.   Pursuant to New York General Business Law § 350, Plaintiffs also seek an order of this Court that includes, but is not limited to, an order enjoining WF from continuing to engage in false advertising or any other act prohibited by law.

224.   Plaintiffs and the other members of the Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

225.   The unfair and deceptive acts and practices of WF, as described above, present a serious threat to Plaintiffs and the other members of the Class.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment on behalf of herself and the proposed Class providing such relief as follows:

A.     Certification of the Class proposed herein under Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3); appointment of Plaintiff Kellman as representative of the California Class, Plaintiff Starr as representative of the New York Class, and Plaintiffs Kellman and Starr as representatives of the Nationwide Class; and appointment of their undersigned counsel as counsel for the Classes;

B.     A declaration that WF is financially responsible for notifying members of the Classes of the pendency of this suit;

C.     An order requiring an accounting for, and imposition of a constructive trust upon, all monies received by WF as a result of the unfair, misleading, fraudulent, and unlawful conduct alleged herein;

D.     Restitution, disgorgement, refund, and/or other monetary damages, together with costs and disbursements, including reasonable attorneys' fees pursuant to the applicable statutes and prejudgment interest at the maximum rate allowable by law;

E.     Injunctive relief on behalf of the Classes, enjoining WF's unlawful and deceptive acts;

F.     Statutory damages in the maximum amount provided by law;

G.     Punitive damages in accordance with proof and in an amount consistent with applicable precedent; and

H.     Such further relief as this Court may deem just and proper.

CLASS ACTION COMPLAINT

1

## **JURY TRIAL DEMANDED**

2

Plaintiffs and the Class members hereby demand a trial by jury.

3

4

DATED: November 14, 2017

5

Stephanie R. Tatar - State Bar No. 237792
TATAR LAW FIRM, APC

6

3500 West Olive Avenue, Suite 300
Burbank, California 91505

7

Tel. (323) 744-1146
Fax. (888) 778-5695

8

Stephanie@thetatarlawfirm.com

9

**THE GOLAN FIRM**

10

Yvette Golan (*pro hac vice* forthcoming)
1712 N Street, NW, Suite 302

11

Washington, D.C. 20036
Tel: (866) 298-4150, ext. 101

12

Fax: (928) 441-8250

13

**FRANCIS & MAILMAN, P.C.**

14

James A. Francis (*pro hac vice* forthcoming)
David A. Searles (*pro hac vice* forthcoming)

15

Land Title Building, Suite 1902
100 South Broad Street

16

Philadelphia, PA 19110
Tel: (215) 735-8600

17

Fax: (215) 950-8000

18

**TURKE & STRAUSS, LLP**

19

Samuel J. Strauss (*pro hac vice* forthcoming)
613 Williamson Street #209

20

Madison, WI 53703
Tel: 608.237.1775

21

Fax: 608.509.4423

22

23

24

25

26

27

38

CLASS ACTION COMPLAINT