UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

SHOSHA KELLMAN, et al.,

Plaintiffs,

v.

WHOLE FOODS MARKET, INC., et al.,

Defendants.

Case No. 17-cv-06584-LB

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO STRIKE**

Re: ECF No. 35

## INTRODUCTION

Shosha Kellman, a California resident, and Abigail Starr, a New York resident, are suing four corporate entities associated with the Whole Foods supermarket chain. The plaintiffs allege that Whole Foods has been mislabeling certain household and body-care products that it sells as "hypoallergenic" despite the fact that they actually contain known allergens.

The plaintiffs bring this suit as a class action under Federal Rule of Civil Procedure 23 on behalf of themselves and other consumers who bought these "hypoallergenic"-labeled products. They define three classes: a nationwide class, a California class, and a New York class. The plaintiffs' operative Second Amended Complaint ("SAC") asserts claims for (1) breach of express warranty, (2) unjust enrichment, (3) unfair and deceptive acts and practices in violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750–1785, (4) violations of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500 et

United States District Court
Northern District of California

seq., (5) violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 et seq., (6) violations of New York's General Business Law § 349, and (7) violations of New York's General Business Law § 350. The plaintiffs name as defendants (1) Whole Foods Market, Inc. ("WFMI"), the parent Whole Foods holding company, (2) Whole Foods Market California, Inc. ("WFM California"), a subsidiary that operates Whole Foods retail stores in northern California, (3) Whole Foods Market Services, Inc. ("WFM Services"), a subsidiary that provides various administrative services to other Whole Foods entities, and (4) Whole Foods Market Group, Inc. ("WFM Group"), a subsidiary that operates Whole Foods retail stores in various eastern states, including New York.

The defendants move to dismiss under Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6). First, the defendants argue that the court does not have personal jurisdiction over the non-Californian defendants WFMI, WFM Services, and WFM Group, or over Ms. Starr's non-Californian claims, and that the court should dismiss these defendants and claims under Rule 12(b)(2). Second, the defendants argue that the plaintiffs have not alleged plausible claims for false or misleading advertising or for breach of express warranty and that the court should dismiss these claims under Rule 12(b)(6). Third, the defendants argue that the plaintiffs do not have standing to pursue claims for any products other than the ones that the plaintiffs themselves purchased and that the court should dismiss these claims under Rule 12(b)(1). The defendants also move to strike allegations about products that the plaintiffs themselves did not purchase and product representations that the plaintiffs themselves did not see or rely on from the SAC under Rule 12(f).

The court finds this matter suitable for determination without oral argument. N.D. Cal. Civil L.R. 7-1(b). The court grants the defendants' motion in part and (1) dismisses WFMI, WFM Services, and WFM Group for lack of personal jurisdiction, (2) dismisses Ms. Starr's claims for failure to state a claim against WFM California, and (3) dismisses the plaintiffs' claims for products for which they identify no ingredients (and therefore identify no allergens) for lack of standing. In all other respects, the court denies the defendants' motion to dismiss. The court denies

the defendants' motion to strike. The court grants the plaintiffs leave to file an amended complaint within 14 days of the date of this order.

## STATEMENT[1]

### 1. Allergens and Skin Sensitizers

According to the Centers for Disease Control and Prevention ("CDC"), 8.8 million children (12% of U.S. children) reported skin allergies in 2012.[2] Skin allergies are even more prevalent among young children: the CDC reports that 14.2% of children between the ages of 0 and 4 suffered a skin allergy in 2012.[3] These numbers may underreport the prevalence of allergic-contact dermatitis: recent studies show that somewhere between 14–70% of children suffer from skin allergies, based on positive patch skin tests.[4] Skin allergies are similarly prevalent among adults.[5]

When skin is exposed to a sufficient amount of a chemical allergen, the skin is "sensitized."[6] Upon re-exposure to the allergen, the skin initiates an inflammatory cascade, causing skin changes associated with allergic-contact dermatitis.[7] These include redness, edema (fluid retention), scaling, fissures (cracking), vesicles (fluid-filled sacs), bullae (bubble-like cavities), and eventually oozing.[8] Contact sensitization and related skin allergies can severely affect a person's quality of life, depending on the severity and the site of skin sensitization.[9] People suffering from noticeable skin allergies will try to hide the symptoms under clothing if possible, and if not, will

---

[1] Unless otherwise noted, the facts recited in the Statement are allegations from the SAC.

[2] SAC – ECF No. 31 at 16 (¶ 113). Record citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[3] *Id.*

[4] *Id.* (¶ 114).

[5] *Id.* (¶ 115).

[6] *Id.* (¶ 116).

[7] *Id.*

[8] *Id.*

[9] *Id.* (¶ 117).

United States District Court
Northern District of California

avoid public spaces entirely.[10] In either case, skin allergies can dramatically affect a person's confidence and engagement in life.[11]

It is difficult to identify the substance causing an allergic response.[12] Allergic-contact dermatitis develops several days after exposure to a skin allergen.[13] Some substances do not cause symptoms until a week after exposure.[14] Additionally, once an individual is sensitized to an allergen, future contact with the allergen can trigger a response in the original site of sensitization.[15] For example, if someone had an allergic response to a product used on the face, and later used a different product containing the same allergen on the legs, the allergic response will occur again on the face — even if the face was never exposed to the second product.[16] When a consumer cannot identify the material that triggers an allergic reaction, allergic-contact dermatitis will persist, and, it is believed, will take longer to resolve even after the cause is identified.[17] Once skin is sensitized, even a minute amount of the chemical allergen is enough to cause a full-blown allergic response.[18]

The scientific and regulatory definition of a "skin sensitizer" is a substance that causes sensitization by skin contact in a substantial number of persons based on human evidence or appropriate animal testing.[19] If a skin sensitizer makes up 0.1% or more of a product, or if the product contains a sensitizer that may elicit an allergic response at concentrations smaller than 0.1% in individuals who are already sensitized to the chemical, the entire product mixture is classified as a skin sensitizer, i.e., the product causes sensitization by skin contact in a substantial

---

[10] *Id.*

[11] *Id.*

[12] *Id.* (¶ 118).

[13] *Id.* at 16–17 (¶ 118).

[14] *Id.* at 17 (¶ 118).

[15] *Id.* (¶ 119).

[16] *Id.*

[17] *Id.* (¶ 120).

[18] *Id.* at 18 (¶ 126).

[19] *Id.* at 17 (¶ 122).

United States District Court
Northern District of California

number of persons based on human evidence or appropriate animal testing.[20] A product that is a skin sensitizer is not hypoallergenic.[21]

**2. Whole Foods's Labeling of Products as "Hypoallergenic"**

Whole Foods advertises itself as "America's Healthiest Grocery Store."[22] It lists "quality standards" and identifies as its top standard: "We carefully evaluate each and every product we sell."[23] Whole Foods stresses not only product safety, but also ingredient safety.[24] As Whole Foods explains:

> **OUR BODY CARE QUALITY STANDARDS**
>
> We carry the finest, high-quality beauty, hair and body care products available because we believe the quality of the items and ingredients you put on your body is as important as the foods and nutritional supplements you put in your body. We evaluate the quality of personal care products in terms of ingredients, experience, and efficacy.[25]

Whole Foods knows that consumers rely upon it to not only test the final product formulation for basic safety, but also to select only those ingredients that it considers to be safe.[26]

On product labels and on its retail website, Whole Foods represents that certain of the products it sells are "hypoallergenic."[27] Whole Foods does not label all of its products as "hypoallergenic."[28] Instead, it labels only some of its products as "hypoallergenic," giving consumers the impression that it carefully reviewed each ingredient in its products to ensure that the "hypoallergenic" promise was made for only those products that are truly hypoallergenic.[29]

---

[20] *Id.* (¶ 123).

[21] *Id.* (¶ 124).

[22] *Id.* at 19 (¶ 139). As a note, in many paragraphs of the SAC, the plaintiffs do not distinguish between the defendants but instead make allegations against "Whole Foods" generally.

[23] *Id.* (¶ 140).

[24] *Id.* (¶ 141).

[25] *Id.*

[26] *Id.* (¶ 138).

[27] *Id.* (¶ 143).

[28] *Id.* at 20 (¶ 146); SAC Ex. 6 – ECF No. 31-6 (listing examples of products that Whole Foods does not label as "hypoallergenic").

[29] SAC – ECF No. 31 at 20 (¶ 146).

These products, however, actually contain skin sensitizers, skin irritants, eye irritants, and other deleterious compounds.[30]

The plaintiffs name (1) 365 Baby Foaming Wash, (2) 365 Baby Lotion, (3) 365 Baby Shampoo, (4) 365 Bubble Bath, (5) 365 Gentle Skin Cleanser, (6) 365 Kids' Foaming Wash, (7) 365 Maximum Moisture Body Lotion, (8) 365 Moisturizing Lotion, (9) Whole Foods Market Baby Laundry Detergent, (10) Whole Foods Market Organic Laundry Detergent, (11) Wild Kratts Bubble Bath, and (12) Wild Kratts Kids Foaming Body Wash (which the SAC calls the "Falsely Labeled Products").[31] Whole Foods represents that each of these products is "hypoallergenic."[32] Whole Foods additionally represents that the products are "non-toxic" and "safe," have "only the gentlest ingredients," and/or cause "no tears."[33] The plaintiffs allege, however, that each of these products contains known skin sensitizers.[34] Each of these products contains known skin or eye irritants, carcinogens, teratogens, mutagens, or pollutants.[35] Each of these products contains substances that have not been adequately assessed for safety or skin-sensitization potential.[36]

The plaintiffs additionally name (1) 365 Diapers, (2) 365 Sustainably Soft Bath Tissue, (3) 365 Sustainably Soft Facial Tissue, (4) 365 Facial Tissue, (5) 365 Paper Towels, and (6) 365 Training Pants.[37] Whole Foods represents that each of these products is "hypoallergenic."[38] Whole Foods does not disclose the ingredients in these products.[39] The plaintiffs allege that these products may

---

[30] *Id.* at 19 (¶ 143).
[31] *Id.* at 19–20 (¶ 144).
[32] *Id.* (¶¶ 143–45); SAC Ex. 1 – ECF No. 31-1.
[33] SAC – ECF No. 31 at 29 (¶ 194).
[34] *Id.* at 20 (¶ 147).
[35] *Id.*
[36] *Id.*
[37] *Id.* at 28 (¶ 188).
[38] *Id.*
[39] *Id.*

United States District Court
Northern District of California

contain known skin sensitizers or other harmful chemicals and therefore also may be "Falsely Labeled Products."[40]

Whole Foods holds itself out to the public as a trusted expert in the area of hypoallergenic, safe, mild, and gentle personal care products.[41] For example, in its "Official Whole Foods Market Blog," Whole Foods encourages consumers who want to avoid allergens to purchase Whole-Foods-brand products because they lack the ingredients Whole Foods identifies in its in-house list of banned "unacceptable ingredients" for body-care, premium-body-care, and household cleaners.[42] Whole Foods fails to disclose, however, that many ingredients in its products are known skin allergens, even though they are not banned on its list of "unacceptable ingredients."[43]

Whole Foods knows what ingredients are added to each product and therefore knows that the products at issue contain skin sensitizers, irritants, or otherwise toxic ingredients.[44] Whole Foods also knows that consumers prefer hypoallergenic products and will pay a premium for hypoallergenic products or would not purchase such products at all unless they were hypoallergenic as advertised.[45] Whole Foods encourages consumers' preference for hypoallergenic products — and specifically for Whole-Foods-brand products — explaining to consumers that "we believe the quality of the items and ingredients you put on your body is as important as the foods and nutritional supplements you put in your body."[46] The plaintiffs allege that Whole Foods made false, deceptive, and misleading representations and omissions that its products were hypoallergenic when they were not, with the intent to have customers buy its "hypoallergenic"

---

[40] *Id.*

[41] *Id.* at 29 (¶ 197).

[42] *Id.* (¶ 195).

[43] *Id.* (¶ 196).

[44] *Id.* at 29–30 (¶¶ 199–201).

[45] *Id.* at 30 (¶ 202).

[46] *Id.* (¶ 203).

United States District Court
Northern District of California

products over its competitors' products, or over not buying products at all, and to pay a premium for those products.[47]

**3. The Plaintiffs' Purchases of Whole Foods's "Hypoallergenic" Products**

For two years, plaintiff Shosha Kellman, a California resident, regularly bought Whole Foods's 365 Gentle Skin Cleanser approximately every four to six weeks from Whole Foods supermarkets in Berkeley and Oakland, California, and sometimes bought Whole Foods's 365 Moisturizing Lotion as well.[48] Ms. Kellman and her family members have all suffered skin irritation, eye irritation, dermatitis, and/or an allergic skin reaction in the past.[49] Ms. Kellman states that a significant reason for her purchase of these Whole Foods products was that they were labeled "hypoallergenic."[50] Ms. Kellman purchased, purchased more of, or paid more for, these products than she would have had she known that the products contained skin sensitizers, irritants, toxins, carcinogens, or otherwise harmful chemicals.[51] Had she known at the time that the products were not hypoallergenic and contained these compounds, she would not have purchased them.[52]

Plaintiff Abigail Starr, a New York resident, regularly bought Whole Foods's 365 Moisturizing Lotion from two Whole Foods supermarkets in Manhattan, New York, and on multiple occasions bought Whole Foods's 365 Bubble Bath, Facial Tissue, and Paper Towels as well.[53] Ms. Starr and her family members have all suffered skin irritation, eye irritation, dermatitis, and/or an allergic skin reaction in the past.[54] Ms. Starr states that a significant reason for her

---

[47] *Id.* (¶¶ 205–07).
[48] *Id.* at 4 (¶ 17).
[49] *Id.* (¶ 19).
[50] *Id.* (¶ 18).
[51] *Id.* at 5 (¶ 24).
[52] *Id.* (¶¶ 22–23).
[53] *Id.* (¶ 27).
[54] *Id.* at 6 (¶ 29).

purchase of these Whole Foods products was that they were labeled "hypoallergenic."[55] Ms. Starr purchased, purchased more of, or paid more for, these products than she would have had she known that the products contained skin sensitizers, irritants, toxins, carcinogens, or otherwise harmful chemicals.[56] Had she known at the time that the products were not hypoallergenic and contained these compounds, she would not have purchased them.[57]

## STANDARD OF REVIEW

### 1. Rule 12(b)(1)

The defendants argue that the plaintiffs do not have standing to plead claims for products that they themselves did not purchase and move to dismiss such claims for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).

A defendant's Rule 12(b)(1) jurisdictional attack can be either facial or factual. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). "A 'facial' attack asserts that a complaint's allegations are themselves insufficient to invoke jurisdiction, while a 'factual' attack asserts that the complaint's allegations, though adequate on their face to invoke jurisdiction, are untrue." *Courthouse News Serv. v. Planet*, 750 F.3d 776, 780 n.3 (9th Cir. 2014). This is a facial attack. The court thus "accept[s] all allegations of fact in the complaint as true and construe[s] them in the light most favorable to the plaintiff[]." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003).

Federal-court jurisdiction extends only to "cases" and "controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "The 'irreducible constitutional minimum' of standing consists of three elements." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "The plaintiff must have (1) suffered an injury in fact, (2) that

---

[55] *Id.* (¶ 28).

[56] *Id.* (¶ 34).

[57] *Id.* (¶¶ 32–33).



United States District Court
Northern District of California

is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan*, 504 U.S. at 560–61; *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Id.* (citing *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990)). "Where, as here, a case is at the pleading stage, the plaintiff must 'clearly allege facts demonstrating' each element." *Id.* (internal ellipsis omitted) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)). "In a class action, standing is satisfied if at least one named plaintiff meets the requirements." *Bates v. UPS*, 511 F.3d 974, 985 (9th Cir. 2007) (citing *Armstrong v. Davis*, 275 F.3d 849, 860 (9th Cir. 2001)).

"Beyond the constitutional requirements, the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing." *Valley Forge Christian College v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982). The prudential limitations on federal-court jurisdiction require the following: (1) "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties," (2) courts will not adjudicate "'abstract questions of wide public significance' which amount to 'generalized grievances,'" and (3) "the plaintiff's complaint [must] fall within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Id.* at 474–75 (quoting *Warth*, 422 U.S. at 499; *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153 (1970)).

**2. Rule 12(b)(2)**

WFMI, WFM Services, and WFM Group move to dismiss the claims against them for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2).

"'In opposing a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction is proper.'" *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015) (quoting *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1073 (9th Cir. 2011)). The parties may submit, and the court may consider, declarations and other evidence

United States District Court
Northern District of California

outside the pleadings in determining whether it has personal jurisdiction. *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001).

"'Where, as here, the defendant's motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts to withstand the motion to dismiss.'" *Ranza*, 793 F.3d at 1068 (some internal quotation marks omitted) (quoting *CollegeSource*, 653 F.3d at 1073). "[U]ncontroverted allegations must be taken as true, and '[c]onflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor.'" *Id.* (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004)). But courts "may not assume the truth of allegations in a pleading which are contradicted by affidavit[.]" *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011) (internal quotation marks omitted) (quoting *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1284 (9th Cir. 1977)); *accord Ranza*, 793 F.3d at 1068 ("A plaintiff may not simply rest on the 'bare allegations of the complaint.'") (internal brackets omitted) (quoting *Schwarzenegger*, 374 F.3d at 800).

**3. Rule 12(b)(6)**

The defendants move to dismiss the plaintiffs' claims for false or misleading advertising and for breach of express warranty for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief" to give the defendant "fair notice" of what the claims are and the grounds upon which they rest. *See* Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint does not need detailed factual allegations, but "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a claim for relief above the speculative level[.]" *Twombly*, 550 U.S. at 555 (citations omitted).

To survive a motion to dismiss, a complaint must contain sufficient factual allegations that, when accepted as true, "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 557). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557) (some internal quotation marks omitted).

## ANALYSIS

### 1. The Court Lacks Personal Jurisdiction Over WFMI, WFM Services, and WFM Group

#### 1.1 Governing Law

In diversity cases such as this one, "'[f]ederal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons.'" *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014)). "Because 'California's long-arm statute allows the exercise of personal jurisdiction to the full extent permissible under the U.S. Constitution,' [a court's] inquiry centers on whether exercising jurisdiction comports with due process." *Id.* (quoting *Daimler*, 571 U.S. at 125; Cal. Code Civ. Proc. § 410.10 ("A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States.")). "Due process requires that the defendant have certain minimum contacts with the forum state such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.* (some internal quotation marks omitted) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

There are two types of personal jurisdiction: general and specific. *Bristol-Myers Squibb Co. v. Super. Ct.*, 137 S. Ct. 1773, 1779–80 (2017) (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 918 (2011)).

United States District Court
Northern District of California

#### 1.1.1 General jurisdiction

"A court with general jurisdiction may hear *any* claim against that defendant, even if all the incidents underlying the claim occurred in a different State." *Bristol-Myers*, 137 S. Ct. at 1780 (emphasis in original) (citing *Goodyear*, 564 U.S. at 919). "But 'only a limited set of affiliations with a forum will render a defendant amenable to' general jurisdiction in that State." *Id.* (quoting *Daimler*, 571 U.S. at 137). "Because the assertion of judicial authority over a defendant is much broader in the case of general jurisdiction than specific jurisdiction, a plaintiff invoking general jurisdiction must meet an 'exacting standard' for the minimum contacts required." *Ranza*, 793 F.3d at 1069 (citing *CollegeSource*, 653 F.3d at 1074). "'[G]eneral jurisdiction requires affiliations so continuous and systematic as to render the foreign corporation essentially at home in the forum State, i.e., comparable to a domestic enterprise in that State.'" *Id.* (quoting *Daimler*, 571 U.S. at 133 n.11). "Such contacts must be 'constant and pervasive.'" *Id.* (citing *Daimler*, 571 U.S. at 122). "The paradigmatic locations where general jurisdiction is appropriate over a corporation are its place of incorporation and its principal place of business." *Id.* (citing *Daimler*, 571 U.S. at 137). "Only in an 'exceptional case' will general jurisdiction be available anywhere else." *Id.* (some internal quotation marks omitted) (quoting *Martinez v. Aero Caribbean*, 764 F.3d 1062, 1070 (9th Cir. 2014)).

#### 1.1.2 Specific jurisdiction

"Specific jurisdiction is very different." *Bristol-Myers*, 137 S. Ct. at 1780. "In order for a state court to exercise specific jurisdiction, 'the *suit*' must 'arise out of or relate to the defendant's contacts with the *forum*.'" *Id.* (emphasis in original, internal brackets omitted) (quoting *Daimler*, 571 U.S. at 127). "In other words, there must be 'an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" *Id.* (internal brackets omitted) (quoting *Goodyear*, 564 U.S. at 919). "For this reason, 'specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction.'" *Id.* (quoting *Goodyear*, 564 U.S. at 919). The Ninth Circuit employs a three-part test to assess

whether a defendant has sufficient contacts with the forum state to be subject to specific personal jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Picot*, 780 F.3d at 1211 (quoting *Schwarzenegger* 374 F.3d at 802). "The plaintiff has the burden of proving the first two prongs." *Id.* at 1211–12 (citing *CollegeSource*, 653 F.3d at 1076). "If [s]he does so, the burden shifts to the defendant to set forth a 'compelling case' that the exercise of jurisdiction would not be reasonable." *Id.* at 1212 (some internal quotation marks omitted) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

**1.2 Application**

**1.2.1 General jurisdiction**

WFMI, WFM Services, and WFM Group are not incorporated in California and do not have their principal places of business here. WFMI and WFM Services are incorporated and have their principal places of business in Texas.[58] WFM Group is incorporated in Delaware and has its principal place of business in Texas.[59] Consequently, only in an "exceptional case" could they be subject to general jurisdiction in California. *Ranza*, 793 F.3d at 1069 (quoting *Martinez*, 764 F.3d at 1070). The plaintiffs have not met their burden of showing that this is that exceptional case.

The plaintiffs argue that the defendants are subject to general jurisdiction because (as they allege) (1) WFMI has employees in California, operates stores in California, and dictates every facet of WFM California's business and (2) WFM Services has employees and other assets in

---

[58] Warren Decl. – ECF No. 36 at 2 (¶ 2), 4 (¶ 20).

[59] *Id.* at 5 (¶ 31).



United States District Court
Northern District of California

California and designs, develops, advertises, and markets products to be sold in California.[60] This fails to establish general jurisdiction for two reasons. First, the defendants have submitted a sworn declaration that WFMI and WFM Services do not in fact have any employees in California, do not operate any stores in California, do not design, manufacture, distribute, or sell and goods in California, and do not dictate WFM California's business.[61] The plaintiffs say that this contradicts the allegations in their SAC.[62] But on a motion to dismiss for lack of personal jurisdiction where the defendants have submitted a sworn declaration, the plaintiffs may not rest on bare, unsworn allegations in their complaint. *Mavrix*, 647 F.3d at 1223. If the plaintiffs had submitted their own sworn declaration and that declaration had contradicted the defendants' declaration, the court would resolve the conflicts in the plaintiffs' favor (or hold an evidentiary hearing).[63] But the plaintiffs submitted no such declarations here. Their bare allegations are insufficient to establish general jurisdiction. *Id.*; *accord Ranza*, 793 F.3d at 1068 ("A plaintiff may not simply rest on the 'bare allegations of the complaint.'") (internal brackets omitted).

Second, even if one set aside the defendants' declaration and credited the plaintiffs' allegations about employees in California, store operations in California, product designs or sales in California, and dictating operations in California, their general-jurisdiction arguments would fail. The allegations do not satisfy the "so continuous and systematic as to render the foreign corporation essentially at home in the forum State" standard that the Supreme Court set out in *Daimler* and *Bristol-Myers*. They are therefore insufficient for general jurisdiction. *Cf. BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1559 (2017) (defendant railroad had more than 2000 employees and operated over 2000 miles of track in the forum state; that was insufficient for general

---

[60] Pls. Opp'n – ECF No. 38-1 at 18–20. The plaintiffs do not say anything about why WFM Group would be subject to general jurisdiction. *See id.*

[61] Warren Decl. – ECF No. 36 at 2–3 (¶¶ 3, 5–15), 4 (¶¶ 24–27).

[62] Pls. Opp'n – ECF No. 38-1 at 10.

[63] *Cf., e.g., Goes Int'l, AB v. Dodur Ltd.*, No. 3:14-cv-05666-LB, 2015 WL 5043296, at *10 (N.D. Cal. Aug. 26, 2015) (holding, in a case where both sides submitted declarations, that "[t]he court resolves any conflicts in the declarations in [the plaintiff]'s favor") (citing *Schwarzenegger*, 374 F.3d at 800) (cited by Pls. Opp'n – ECF No. 38-1 at 18).

jurisdiction in that state because "'the general jurisdiction inquiry does not focus solely on the magnitude of the defendant's in-state contacts'" and "in-state business . . . does not suffice to permit the assertion of general jurisdiction") (quoting *Daimler*, 571 U.S. at 139 n.20).[64]

**1.2.2 Specific jurisdiction**

The plaintiffs do not establish that WFMI, WFM Services, or WFM Group purposefully directed any of their activities or consummated some transaction with California or a California resident or performed some act by which they purposefully availed themselves of the privilege of conducting activities in California.

The plaintiffs first argue that WFMI and WFM Services "intentionally engaged in long-term commercial activities with WFM California and WFM California 365 Brand to sell their private label goods to California consumers."[65] But WFMI and WFM Services themselves do not sell any products (inside or outside California).[66] WFM California — a separate legal entity — may be selling products in California. But where "[WFMI or WFM Services] itself has not put any products into the stream of commerce that might have ended up in the forum, whether through a distributorship agreement or otherwise[, t]hat alone ends the inquiry." *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 459 (9th Cir. 2007) (emphasis removed). WFM Services does have some responsibility for the marketing and advertising of Whole Foods's private label products and is responsible for the content and design of Whole Foods Market's website.[67] But customers cannot buy any of the products at issue in this action on the website.[68] A "mere web presence" or "advertisements that incidentally may have made their way to [the forum state]" are

---

[64] The plaintiffs cite no cases in support of their general-jurisdiction arguments. *See* Pls. Opp'n – ECF 38-1 at 10–12.

[65] Pls. Opp'n – ECF No. 38-1 at 20–21. The plaintiffs do not say anything about why WFM Group would be subject to specific jurisdiction. *See id.*

[66] Warren Decl. – ECF No. 36 at 2 (¶ 6), 4 (¶ 27).

[67] *Id.* at 4–5 (¶¶ 28–29).

[68] While the website contains information about Whole Foods products, the only things that customers can actually buy on the website are catered meals and not any of the products at issue here. *Id.* at 5 (¶ 30).

United States District Court
Northern District of California

insufficient to establish specific jurisdiction without more substantial evidence of contacts with the state. *Id.* at 460 (citing *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1158 (9th Cir. 2006)).[69]

The plaintiffs argue that WFM California and WFM Services are alter egos of WFMI and, consequently, their activities can be imputed to WFMI for jurisdictional purposes.[70] The defendants have submitted a sworn declaration, however, that WFMI, WFM California, and WFM Services each maintained an independent corporate, partnership, or limited-liability-company structure.[71] In any event, the plaintiffs' unsworn and conclusory allegations that WFMI shares office space, employees, and corporate control with its subsidiaries, sets policies for its subsidiaries, and indemnifies its subsidiaries — even if they were credited over the defendants' sworn declaration — do not establish that the various Whole Foods entities are alter egos. "'A parent corporation may be directly involved in financing and macro-management of its subsidiaries . . . without exposing itself to a charge that each subsidiary is merely its alter ego.'" *Ranza*, 793 F.3d at 1074 (quoting *Unocal*, 248 F.3d at 927). For example, the Ninth Circuit found that the parent and subsidiary companies in *Ranza* were not alter egos despite the fact that the parent exercised control over its subsidiary's budget, established general human-resources policies that its subsidiary had to follow, was involved in some of its subsidiary's hiring decisions, operated unified information-tracking systems that all of its subsidiaries used, ensured that its branded products were marketed consistently throughout the world, and required some subsidiary-

---

[69] In support of their arguments, the plaintiffs cite *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984), *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894 (9th Cir. 2002), *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980), *Plant Food Co-Op v. Wolfkill Feed & Fertilizer Corp.*, 633 F.2d 155 (9th Cir. 1980), and *Allen v. Similasan Corp.*, No. 12cv0376-BTM-WMC, 2013 WL 2120825 (S.D. Cal. May 14, 2013), but these cases are inapposite. Each of them involved a defendant that itself actually sold products. *See Keeton*, 465 U.S. at 772 (defendant sold magazines); *Mattel*, 296 F.3d at 899 (defendants "developed a coordinated plan" to distribute albums); *World-Wide Volkswagen*, 444 U.S. at 289 (defendant sold cars to dealerships); *Plant Food*, 633 F.2d at 158 (defendant sold fertilizer); *Allen*, 2013 WL 2120825, at *1 (defendant sold homeopathic products). Here, by contrast, WFMI and WFM Services do not sell anything. Warren Decl. – ECF No. 36 at 2 (¶ 7), 4 (¶ 27).

[70] Pls. Opp'n – ECF No. 38-1 at 13–15.

[71] Warren Decl. – ECF No. 36 at 3 (¶ 15); *see also id.* at 2–3 (¶¶ 7–14, 17), 4 (¶ 26).

company employees to report to parent-company employees on a dotted-line basis. *Id.*[72] The plaintiffs here do not assert, even in unsworn allegations, that WFMI "'dictates every facet of [its subsidiaries'] business,' including 'routine matters of day-to-day operation'" more than the parent company in *Ranza* did, so as to render the Whole Foods entities alter egos where the *Ranza* entities were not. *Cf. id.* (quoting *Unocal*, 248 F.3d at 926); *accord, e.g.*, *In re Conseco Ins. Co. Annuity Mktg. & Sales Practices Litig.*, No. C-05-04726 RMW, 2008 WL 4544441, at *5 (N.D. Cal. Sept. 30, 2008) (sharing of offices, officers, directors between parent and subsidiary or parent's setting of general policies for subsidiary does not establish that they are alter egos, because "it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts" and "[a]ppropriate parental involvement includes: 'monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures'") (some internal quotation marks omitted) (quoting *United States v. Bestfoods*, 524 U.S. 51, 69 (1998); *Unocal*, 248 F.3d at 926).[73]

---

[72] The subsidiary in *Ranza* leased its own facilities, maintained its own accounting books and records, entered into its own contracts, paid its own taxes, set its own prices, took and fulfilled product orders using its own inventory, negotiated its own contracts and licenses, and made routine purchasing and employment decisions without consultations with its parent — in short, it respected corporate formalities. *Ranza*, 793 F.3d at 1074.

[73] The plaintiffs also cite to certain of the defendants' corporate filings, but these do not establish personal jurisdiction. The plaintiffs cite to WFMI's by-laws to claim that "the directors, officers, agents, functionaries, and certain employees 'of any of [WFMI's] direct or indirect wholly-owned subsidiaries, shall be deemed to be serving in such capacity at the request of the Corporation [WFMI].'" SAC – ECF No. 31 at 13 (¶ 96) (brackets in original) (quoting Amended and Restated Bylaws of Whole Foods Market, Inc. at 14 (§ 9.1), *available at* https://www.sec.gov/Archives/edgar/data/865436/000114420417045261/v474128_ex3-3.htm ("Bylaws")). What the by-laws actually say is that WFMI will deem these individuals as serving at WFMI's request for the purposes of indemnifying them from legal actions and investigations that might be brought against them, not in all capacities. *See* Bylaws at 14 (§ 9.1). Similarly, the plaintiffs cite to Whole Foods Market's 2016 annual report to claim that WFMI operates 436 stores in the United States. SAC – ECF No. 31 at 7 (¶ 39). What the annual report actually says is that "we" operate 436 stores. Whole Foods Market, Annual Report at 1 (2016), *available at* http://s21.q4cdn.com/118642233/files/doc_financials/2016/Annual/2016-WFM-Annual-Report.pdf (also attached as Blackman Decl. Ex. A – ECF No. 37-1) (defining "we" as "Whole Foods Market, Inc. and its consolidated subsidiaries"); *id.* at 14 ("As of September 25, 2016, we operated 456 stores: 436 stores in 42 U.S. states and the District of Columbia; 11 stores in Canada; and 9 stores in the U.K."). "WFMI expressly noted that when the word 'we' is used in the Form 10-K, unless otherwise specified, 'we' includes 'Whole Foods Market, Inc., *and* its consolidated subsidiaries.' So, even though WFMI's Form 10-K says that 'we' operate stores . . . it cannot

*(cont'd)*

Finally, the plaintiffs argue that the court has personal jurisdiction over WFMI on an agency theory because "its California subsidiaries perform services 'sufficiently important to the parent corporation that if it did not have a representative to perform them, the parent corporation . . . would undertake to perform substantially similar services,'" quoting *Harris Rutsky & Co. Insurance Services, Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1135 (9th Cir. 2003).[74] But that personal-jurisdiction test is no longer good law. The Supreme Court's decision in *Daimler* rejected that test as one that "stacks the deck, for it will always yield a pro-jurisdiction answer: Anything a corporation does through an independent contractor, subsidiary, or distributor is presumably something that the corporation would do 'by other means' if the independent contractor, subsidiary, or distributor did not exist." *See Williams v. Yamaha Motor Co. Ltd.*, 851 F.3d 1015, 1024 (9th Cir. 2017) (quoting *Daimler*, 571 U.S. at 135–36, and rejecting that test for both general jurisdiction and specific jurisdiction). Instead, to establish personal jurisdiction on an agency theory, the plaintiffs must show that the parent company had "the right to substantially control its subsidiary's activities." *Id.* at 1024–25. As discussed above, the plaintiffs have not met their burden to show that level of substantial control here.

*          *          *

As the plaintiffs have not met their burden of establishing either general or special jurisdiction over WFMI, WFM Services, or WFM Group, the court dismisses them under Federal Rule of Civil Procedure 12(b)(2).

**2. Ms. Starr Does Not Plead a Plausible Claim Against WFM California**

The defendants argue that the court lacks jurisdiction over plaintiff Abigail Starr's claims. It does not appear that Ms. Starr has any claims against the one remaining defendant in this action,

---

reasonably be read to mean that WFMI itself operates those stores." *Vasquez v. Whole Foods Market, Inc.*, __ F. Supp. 3d __, No. 17-cv-00112 (APM), 2018 WL 810232, at *7 (D.D.C. Feb. 9, 2018) (emphasis in original, citations omitted) (rejecting identical personal-jurisdiction argument made by plaintiffs in another case).

[74] Pls. Opp'n – ECF No. 38-1 at 21 (ellipsis in original).

WFM California. The SAC does not state or distinguish which plaintiffs are bringing which claims against which defendants for any of the seven claims alleged,[75] and neither side addresses in their motion-to-dismiss filings whether Ms. Starr is bringing any claims against WFM California (as opposed to claims only against the other defendants). But given that Ms. Starr alleges only that she bought products in New York and alleges only that WFM California operates stores in Northern California, it does not appear that Ms. Starr pleads a plausible claim against WFM California. The court dismisses Ms. Starr's claims, with leave to amend.

**3. Ms. Kellman Pleads a Plausible Claim for Violations of California's Consumers Legal Remedies Act, False Advertising Law, and Unfair Competition Law**

**3.1 Governing Law**

Claims under the CLRA, FAL, and UCL are governed by the "reasonable consumer" test. *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (citing *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995)). "Under the reasonable consumer standard, [plaintiffs] must show that 'members of the public are likely to be deceived.'" *Id.* (some internal quotation marks omitted) (quoting *Freeman*, 68 F.3d at 289). "[W]hether a business practice is deceptive will usually be a question of fact not appropriate for decision on [a motion to dismiss]," as "[w]hether a practice is deceptive, fraudulent, or unfair is generally a question of fact which requires 'consideration and weighing of evidence from both sides' and which usually cannot be made on [a motion to dismiss]." *Id.* at 938–39 (some internal quotation marks omitted) (quoting *Linear Tech. Corp. v. Applied Materials, Inc.*, 152 Cal. App. 4th 115, 134–35 (2007)).

"The California Supreme Court has recognized that these laws prohibit 'not only advertising which is false, but also advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.'" *Id.* (internal brackets and some internal quotation marks omitted) (quoting *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 951 (2002)).

[75] *See* SAC – ECF No. 36–45 (¶¶ 236–95).



United States District Court
Northern District of California

"A perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under these sections." *Day v. AT&T Corp.*, 63 Cal. App. 4th 325, 332–33 (1998).

**3.2 Application**

Each of the complained-of products bears a label that it is "hypoallergenic."[76] Ms. Kellman alleges that a reasonable consumer would believe that a product labeled as hypoallergenic will not cause skin irritation, skin corrosion, or eye damage when used as directed.[77] Ms. Kellman further alleges that a reasonable customer would believe that a hypoallergenic product does not contain a significant amount of ingredients known to cause skin irritation, skin corrosion, and/or eye damage.[78]

Ms. Kellman further alleges that if a skin sensitizer makes up more than 0.1% of a product, or if a product contains a sensitizer that may elicit an allergic response at concentrations smaller than 0.1% in individuals who are already sensitized to the chemical, the entire product is classified as a skin sensitizer, i.e., the product causes skin sensitization in a substantial number of people and is therefore not hypoallergenic.[79] Ms. Kellman further alleges that all of the complained-of products contain skin-sensitizer concentrations over those thresholds.[80] This plausibly alleges that the products cause skin sensitizations in a substantial number of people, and that they therefore are not hypoallergenic, and thus that a reasonable customer would be likely to be deceived by their "hypoallergenic" label. This states a claim.

The defendants raise a number of arguments, but none of them is availing. First, the defendants state that the two products that Ms. Kellman purchased "do not simply say 'hypoallergenic.' They state (correctly): 'Independent lab results show this gentle formula is

---

[76] SAC Exs. 1, 8 – ECF Nos. 31-1, 31-8.

[77] SAC – ECF No. 31 at 18 (¶ 131).

[78] *Id.* (¶ 132).

[79] *Id.* at 17 (¶¶ 123–24).

[80] *Id.* at 18 (¶ 128).



United States District Court
Northern District of California

hypoallergenic and noncomedogenic' or 'Independent lab results show this daily moisturizer is hypoallergenic and noncomedogenic.'"[81] The defendants claim that "[a]t most, the representations affirm that the products have been tested and determined to be hypoallergenic" and that "a statement that says the product has been tested to confirm it is less likely to cause a reaction than a similar product means something different than just saying 'hypoallergenic.'"[82] The defendants argue that the plaintiffs do not allege that the defendants falsified or misstated the test results, and hence their statements are not misleading. This argument fails. It is certainly plausible at the pleading stage that a reasonable customer would understand a representation that a product has been independent-lab tested and determined to be hypoallergenic to mean that the product actually *is* hypoallergenic. The defendants cite no cases that support their argument that adding the words "[i]ndependent lab results show this [product] is" before the word "hypoallergenic" somehow renders their representation less misleading if (as sufficiently alleged here) the product is in fact not hypoallergenic. If anything, saying that the "hypoallergenic" representation is based on lab results may make it more misleading, not less. *Cf. In re Clorox Consumer Litig.*, 894 F. Supp. 2d 1224, 1234 (N.D. Cal. 2012) (statements that product representations are "based on lab tests" potentially bolsters "Plaintiffs' contention that reasonable customers would take the [defendants]' representations to be statements of fact").

Second, the defendants argue that "reasonable customers would not interpret these statements as a promise that the products contain no skin sensitizers or will never cause an allergic response."[83] This mischaracterizes the plaintiffs' claims. The plaintiffs are not alleging that a product must contain no skin sensitizers or never cause an allergic response to be hypoallergenic.[84] They are alleging that the defendants' products contain a sufficiently high concentration of skin sensitizers that they may cause sensitization reactions in a substantial number of people.[85] The

[81] Defs. Mot. – ECF No. 35 at 31.

[82] *Id.*; Defs. Reply – ECF No. 39 at 19.

[83] Defs. Mot. – ECF No. 35 at 31.

[84] Pls. Opp'n – ECF No. 38-1 at 29.

[85] SAC – ECF No. 31 at 17–18 (¶¶ 123–24, 128).



United States District Court
Northern District of California

defendants appear to object to the plaintiffs' definition of "hypoallergenic" and argue that under other interpretations of "hypoallergenic" (e.g., "products that manufacturers claim produce fewer allergic reactions than other products"[86]), their statements are not false. But how a reasonable customer would interpret "hypoallergenic" is not a question that can be resolved (at least on this record) on a motion to dismiss. *Cf. Jou v. Kimberly-Clark Corp.*, No. C-13-03075 JSC, 2013 WL 6491158, at *7 (N.D. Cal. Dec. 10, 2013) (adopting plaintiffs' allegations that a reasonable customer would interpret a label that a product is "natural" as meaning that it has no non-natural ingredients and holding that defendants' alternative interpretation that "natural" means the product has at least one natural ingredient could not be resolved on a motion to dismiss).[87]

Third, the defendants argue that "[r]easonable customers simply do not think in terms of skin sensitizers, sensitized individuals or 0.1% concentration levels. They think in terms of the likelihood that this product may cause an allergic response."[88] This again mischaracterizes the plaintiffs' claims. The plaintiffs are not alleging that reasonable customers think in terms of skin sensitizers or concentration levels. They allege that a product with more than a 0.1%-skin-sensitizer-concentration level (or a lower concentration level for certain people and certain sensitizers) "causes sensitization in a substantial number of persons,"[89] i.e., that as a factual matter, a substantial number of people who use such a product will suffer allergic reactions. As the defendants concede, this is what customers think about. The defendants appear to object to that factual allegation and intimate that 0.1%-concentration levels do not in fact cause people to suffer allergic reactions.[90] But whether 0.1%-concentration levels actually cause people to suffer allergic

---

86 Defs. Mot. – ECF No. 35 at 31.

87 Consequently, even if the plaintiffs were alleging (as the defendants claim) that a reasonable customer would understand "hypoallergenic" to mean that a product contains no skin sensitizers, that interpretation could not be rejected (at least on this record) on a motion to dismiss.

88 Defs. Reply – ECF No. 39 at 21.

89 SAC – ECF No. 31 at 17 (¶ 123).

90 *See* Defs. Reply – ECF No. 39 at 20 (suggesting that products containing skin sensitizers can be formulated in a way such that the actual products "have little or no likelihood of causing an allergic response").

reactions (or, for that matter, whether the products at issue actually contain 0.1%-concentration levels) is a fact issue that cannot be resolved on a motion to dismiss. The plaintiffs have alleged that they do, and at this juncture the court must accept those allegations as true. *Cf. Gitson v. Trader Joe's Co.*, No. 13-cv-0133-WHO, 2014 WL 1048640, at *4 (N.D. Mar. 14, 2014) (holding that question of whether food additives actually functioned as artificial flavors or chemical preservatives, as the plaintiffs claimed, or as natural ingredients, as the defendants claimed, could not be resolved on a motion to dismiss because "all material allegations of the complaint [must be] accepted as true").

Ms. Kellman has pleaded plausible claims under the CLRA, FAL, and UCL.

**4. Ms. Kellman Pleads a Plausible Claim for Breach of Express Warranty**

**4.1 Governing Law**

"To prevail on a breach of express warranty claim, Plaintiffs must prove: (1) 'the seller's statements constitute an affirmation of fact or promise or a description of the goods; (2) the statement was part of the basis of the bargain; and (3) the warranty was breached.'" *Brown v. Hain Celestial Grp., Inc.*, 913 F. Supp. 2d 881, 899–900 (N.D. Cal. 2012) (quoting *Weinstat v. Dentsply Int'l, Inc.*, 180 Cal. App. 4th 1213, 1227 (2010)). "Proof of reliance on specific promises is not required." *Id.* (citing *Weinstat*, 180 Cal. App. 4th at 1227).[91] A label or representation that a product is "hypoallergenic" can constitute an express warranty for purposes of a breach-of-warranty claim. *Sebastian v. Kimberly-Clark Corp.*, No. 17cv442-WQH-JMA, 2017 WL 6497675, at *8 (S.D. Cal. Dec. 18, 2017) (holding in the context of a breach-of-warranty claim that

[91] The defendants claim that reliance is required, citing to *Williams v. Beechnut Nutrition Corp.*, 185 Cal. App. 3d 135, 142 (1986). Defs. Mot. – ECF No. 35 at 32. *Williams* in turn relies on the older, pre-Uniform Commercial Code case of *Burr v. Sherwin Williams Co.*, 42 Cal. 2d 682 (1954), for the proposition that reliance is an element of a breach-of-express-warranty claim. As one of the newer cases that the defendants cite explains, "the courts that require reliance have failed to incorporate new language from the Uniform Commercial Code ('UCC') that disavows the reliance requirement." *In re 5-Hour Energy Mktg. & Sales Practices Litig.*, No. MDL 13-2438 PSG (PLAx), 2017 WL 385042, at *10 (C.D. Cal. Jan. 24, 2017) (citing *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 984 n.198 (C.D. Cal. 2015)); *accord, e.g.*, *Weinstat*, 180 Cal. App. 4th at 1227.

"Plaintiffs' allegations regarding Defendant's use of the terms 'natural,' 'gentle,' and 'hypoallergenic' are sufficient to demonstrate that Defendants made 'affirmations of fact or promises or provided a description of its goods'") (internal brackets omitted) (quoting *Viggiano v. Hansen Natural Corp.*, 944 F. Supp. 2d 877, 893 (C.D. Cal. 2013)).

**4.2 Application**

Ms. Kellman plausibly alleges that the defendants' labeling of their products as "hypoallergenic" constituted an affirmation of fact or promise or a description of the goods as being hypoallergenic, that the statement was part of the basis of the bargain, and that the defendants breached their warranty because their products were in fact not hypoallergenic. The defendants rehash their argument that the labels for the two products Ms. Kellman bought state only that "lab results show" the products are hypoallergenic, not that the products actually are hypoallergenic. The addition of the language "lab results show" to the defendants' claim that the products are hypoallergenic does not vitiate a breach-of-express-warranty claim; if anything, it may make a claim more plausible. *Cf. Clorox*, 894 F. Supp. 2d at 1235–36 (fact that advertisements stated that statements about benefits of product were "[b]ased on [a] sensory lab test" furthered impression that the statements were warranties). The defendants cite no cases to the contrary.

Ms. Kellman has pleaded a plausible claim for breach of express warranty.

**5. Ms. Kellman Lacks Standing to Pursue Claims for Unpurchased Products for Which She Identifies No Ingredients or Allergens, But She Has Standing to Pursue Claims for the Other Unpurchased Products Listed in the SAC**

**5.1 Governing Law**

"There is no controlling authority on whether Plaintiffs have standing for products they did not purchase." *Miller v. Ghirardelli Chocolate Co.*, 912 F. Supp. 2d 861, 868 (N.D. Cal. 2012) (citing *Donohue v. Apple, Inc.*, 871 F. Supp. 2d 913, 921–22 (N.D. Cal. 2012) (collecting cases)); *accord, e.g.*, *Shank v. Presidio Brands, Inc.*, No. 17-cv-00232-DMR, 2018 WL 510169, at *6 (N.D. Cal. Jan. 23, 2018). While courts have split on the question of whether actual purchase is required to establish standing, "[t]he majority of the courts that have carefully analyzed the question hold that

a plaintiff may have standing to assert claims for unnamed class members based on products he or she did not purchase so long as the products and alleged misrepresentations are substantially similar." *Miller*, 912 F. Supp. 2d at 869 (citing cases); *accord, e.g.*, *Shank*, 2018 WL 510169, at *6.

Courts look to a number of factors in determining whether products and representations about the products are substantially similar. One line of cases suggests that "the best approach is one which focuses on whether the type of claim and consumer injury is substantially similar as between the purchased and unpurchased products. That determination necessarily focuses on whether the resolution of the asserted claims will be identical between the purchased and unpurchased products." *Ang v. Bimbo Bakeries USA, Inc.*, No. 13-cv-01196-WHO, 2014 WL 1024182, at *8 (N.D. Cal. Mar. 13, 2014); *accord, e.g.*, *Krommenhock v. Post Foods, LLC*, 255 F. Supp. 3d 938, 968–69 (N.D. Cal. 2017) (quoting *Ang*, 2014 WL 1024182, at *8). The fact that products may have different ingredients "is not legally significant in and of itself." *Krommenhock*, 255 F. Supp. 3d at 969 (citing *Gallagher v. Bayer AG*, No. 14-CV-04601-WHO, 2015 WL 1056480, at *10 (N.D. Cal. Mar. 10, 2015)). "Nor is the fact that slightly different words are used to convey the challenged health and wellness statements or the fact that the placement of those words varies across the products necessarily determinative." *Id.* On the other hand, "[w]here the alleged misrepresentations or accused products are dissimilar, courts tend to dismiss claims to the extent they are based on products not purchased." *Brown*, 913 F. Supp. 2d at 891.

**5.2 Application**

Ms. Kellman bought Whole Foods's 365 Gentle Skin Cleanser and 365 Moisturizing Lotion. She brings claims for those products, as well as claims for (broadly speaking) certain bath washes (for adults, children, and babies), lotions (for babies), laundry detergents, tissues, paper towels, diapers, and training pants, which she herself did not purchase. The defendants argue that the latter products are not substantially similar to the cleanser and lotion that Ms. Kellman bought and that Ms. Kellman therefore lacks standing to bring claims for those products.

As a preliminary matter, Ms. Kellman does not have standing to bring claims for the tissues, paper towels, diapers, and training pants listed in the SAC. She identifies no ingredients for these

products and does not allege that they actually contain any skin sensitizers, irritants, or other deleterious compounds. This is insufficient to plead that there were any misrepresentations regarding these products, much less that any misrepresentations are substantially similar to the alleged misrepresentations for the two products that she bought. *Cf. Leonhart v. Nature's Path Foods, Inc.*, No. 13-cv-00492-BLF, 2014 WL 6657809, at *3–4 (N.D. Cal. Nov. 21, 2014) (holding that unpurchased products were not substantially similar and that plaintiff lacked Article III standing where the complaint does not set forth the products' ingredients or explain why the products' representations were misleading); *Gitson*, 2014 WL 1048640, at *6 (holding that claims for unpurchased products that "lack specificity as to what exact undisclosed additives are in the unpurchased products and appear to include claims for alleged undisclosed additives not listed in the SAC" were inadequately pleaded). The court dismisses these claims, with leave to amend.

By contrast, the court holds that the unpurchased products for which Ms. Kellman does allege ingredients are sufficiently similar to the products that Ms. Kellman bought to give rise to standing. The unpurchased body-care products — baby and kids' foaming washes, lotions, shampoos, and bubble baths — are an easier case. Like the purchased products, all are either lotions or cleansing products. All come into direct contact with the body. All bear the same representation as the purchased products: that they are "hypoallergenic."[92] All of them share common ingredients with the purchased products that Ms. Kellman alleges are known allergens and skin sensitizers. And the type of claim and alleged consumer injury is substantially the same as between the purchased and unpurchased products: that people buy them believing them to be hypoallergenic when in fact they contain sufficiently high concentrations of skin sensitizers that they may cause reactions in a substantial number of people.

---

[92] The defendants argue that the two products that Ms. Kellman bought have representations that "lab results show" that they are hypoallergenic, whereas the other products simply say that they are "hypoallergenic." The fact that the representations use slightly different words does not render the products per se dissimilar. *Krommenhock*, 255 F. Supp. 3d at 969. As discussed in Section 3, above, the fact that the defendants couched their "hypoallergenic" representation with the words "lab results show" for two products does not meaningfully change the nature of the representation.

The defendants argue that the products Ms. Kellman bought and the unpurchased products are different because, for example, the former products are meant for adults while several of the latter are meant for babies or children, the former products include a face cleanser while several of the latter are shampoos that clean hair instead of faces, and so forth.[93] But these distinctions do not render the products per se dissimilar for purposes of a standing analysis. *Cf. Shank*, 2018 WL 510169, at *2, *7 (holding, in product-labeling case where plaintiff alleged that products contained unnatural synthetic ingredients, that unpurchased body wash, shampoo, and conditioner were sufficiently similar to purchased face lotion, face scrub, face wash, and shaving cream to give rise to standing); *Brown*, 913 F. Supp. 2d at 885–86, 892 (holding, in product-labeling case where plaintiffs alleged that products labeled "organic" contained significant concentrations of non-organic ingredients, that unpurchased baby powder, toothpaste, and hair cream were sufficiently similar to purchased facial wash, lotion, hand soap, shampoo, conditioner, and lip balm to give rise to standing).

The laundry detergents present a somewhat closer case. Like the unpurchased body-care products, the laundry detergents bear the same "hypoallergenic" representation as the purchased products and share common ingredients with the purchased products that Ms. Kellman alleges are known allergens and skin sensitizers.[94] They differ from the purchased products in that they are not used directly on the skin or body in the same way that the purchased products are. But they are similar in that they come into contact with the skin or body (through clothes washed in those detergents), even if they are not used directly on the skin or body. Significantly, the alleged consumer injury is substantially the same as between the laundry detergents and the products Ms. Kellman bought, namely, that people buy them believing them to be hypoallergenic when in fact

[93] Defs. Mot. – ECF No. 35 at 28.

[94] The defendants argue that Whole Foods Market Organic Laundry Detergent does not share any alleged sensitizers as ingredients with the products that Ms. Kellman bought. Defs. Reply – ECF No. 39 at 19. The detergent's ingredient label, however, lists glycerin as an ingredient, which Ms. Kellman alleges is a suspected skin sensitizer, a skin and eye irritant, and a mutagen. SAC – ECF No. 31 at 22 (¶ 158); SAC Ex. 1 – ECF No. 31-1 at 42, 47. Glycerin is also an ingredient in the 365 Moisturizing Lotion that Ms. Kellman bought. SAC Ex. 1 – ECF No. 31-1 at 37.

United States District Court
Northern District of California

they contain sufficiently high concentrations of skin sensitizers that they may cause reactions in a substantial number of people when they are used. As one of the cases the defendants cite cautions, "courts 'should not be too rigid in applying standing requirements to proposed classes.' In particular, when evaluating whether a plaintiff has standing to sue on behalf of others who have suffered similar, but not identical injuries, . . . [courts] must be careful not to employ too narrow or technical an approach. Rather, [courts] must examine the questions realistically: [they] must reject the temptation to parse too finely, and consider instead the context of the inquiry." *Romero v. HP, Inc.*, No 16-CV-05415-LHK, 2017 WL 386237, at *8 (N.D. Cal. Jan. 27, 2017) (internal quotation marks omitted) (quoting *Brazil v. Dole Food Co., Inc.*, No. 12-CV-01831-LHK, 2013 WL 5312418, at *4 (N.D. Cal. Sept. 23, 2013) (quoting *Armstrong v. Davis*, 275 F.3d 849, 867 (9th Cir. 2011))). Ms. Kellman has alleged enough at this juncture to plead that the unpurchased products and the alleged misrepresentations are substantially similar to the products she bought give rise to standing. *Cf. Miller*, 912 F. Supp. 2d at 872 (where products and representations are dissimilar, dismissal for lack of standing is appropriate, whereas in a closer case, the question may be better resolved at the class-certification stage).

**6. The Court Denies the Defendants' Motion to Strike Paragraphs From the SAC**

**6.1 Governing Law**

A "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "Motions to strike are regarded with disfavor, as they are often used as delaying tactics, and should not be granted 'unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation.'" *Brown*, 913 F. Supp. 2d at 888 (quoting *Colaprico v. Sun Microsystems, Inc.*, 758 F. Supp. 1335, 1339 (N.D. Cal. 1991)). "In the Ninth Circuit, motions to strike are proper, even if the material is not prejudicial to the moving party, if granting the motion would make trial less complicated or otherwise streamline the ultimate resolution of the action." *Id.* (citing *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir.1993), *rev'd on other grounds*, 510 U.S. 517 (1994)). "When considering a motion to strike, a court must view the pleadings in a light most favorable to the non-moving

party." *Id.* (citing *California ex rel. State Lands Comm'n v. United States*, 512 F. Supp. 36, 39 (N.D. Cal. 1981)). The ultimate decision under Rule 12(f) lies within the sound discretion of the court. *See Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 963 (9th Cir. 2018).

**6.2 Application**

Motions to strike are disfavored, and the defendants have not met the standard for a motion to strike here. Among other things, the defendants' argument that allegations regarding unpurchased products should be stricken is unavailing in light of the court's ruling that Ms. Kellman has standing to pursue claims for unpurchased products.

## CONCLUSION

For the foregoing reasons, the court grants the defendants' motion in part and (1) dismisses WFMI, WFM Services, and WFM Group for lack of personal jurisdiction, (2) dismisses Ms. Starr's claims for failure to state a claim against WFM California, and (3) dismisses the plaintiffs' claims for products for which they identify no ingredients (and therefore identify no allergens) for lack of standing. In all other respects, the court denies the defendants' motion to dismiss. The court denies the defendants' motion to strike.

The plaintiffs may file an amended complaint within 14 days of the date of this order. (If they file an amended complaint, they must also file a blackline of their amended complaint against their SAC as an attachment.)

**IT IS SO ORDERED.**

Dated: June 12, 2018

______________________________
LAUREL BEELER
United States Magistrate Judge