# Exhibit 2

Portions to Be Filed Under Seal
Pursuant to Order, Dkt. No. 89

**VENDOR AGREEMENT
BETWEEN
WFM PRIVATE LABEL, L.P. and**
███████████████████████

**EFFECTIVE DATE: MAY 1, 2010
PRODUCT TYPE: PRIVATE LABEL**

1.  <u>General</u>. This agreement (the "**Agreement**") is between WFM Private Label, L.P., a Delaware limited partnership ("**WFMPL**") and Vendor. Vendor agrees to supply stores and distribution centers owned or operated by WFMPL or any of WFMPL's affiliates (together "**WFM**") and to supply third party distributors agreed upon by WFMPL and Vendor with the private label products identified on <u>Exhibit A</u> in addition to any other private label products agreed upon by the parties ("**Products**") in such quantities as they may order from time to time. This Agreement will apply to all Products that bear WFM Trademarks (see Sec. 10) that are supplied by Vendor whether or not listed on <u>Exhibit A</u>. Neither this Agreement nor any forecast or estimate of requirements will constitute an agreement that WFM will order or purchase a specific quantity of Products or services from Vendor. All agreements to purchase a specific quantity of Products will be documented in a purchase order (a "**Purchase Order**") issued by stores or distribution centers operated by WFM or by third party distribution centers agreed upon by WFM and Vendor ("**Authorized Purchasers**"). Neither WFM nor any Authorized Purchaser is obligated to purchase or reimburse Vendor for unused inventory, packaging or labels except to the extent provided in Section 9. Any new product under consideration by WFM is subject to WFM's approval of first product samples and may be abandoned by WFM at any time prior to such approval.

2.  <u>Product Representations, Warranties and Covenants</u>

    (a) Vendor represents, warrants and agrees that:

    (i) Products (including packaging and labels), at the time of delivery to the Delivery Point (see Sec. 7), (A) will be merchantable and otherwise free from impurities or defects; (B) will include packaging that is effective and safe; (C) will not pose a health or safety hazard when used for their intended purpose; (D) will not be contaminated with any foreign substance; (E) will not include any ingredient or additive that has not been disclosed to WFMPL; (F) will not include any illegal, misleading or untrue label claim; (G) will not otherwise be adulterated or misbranded within the meaning of Applicable Law and will comply with all Applicable Laws; (H) will be consistent with its original quality at all times during its designated shelf life (assuming proper storage and handling after delivery); and (I) will be consistent with samples provided to WFMPL and will comply with all Product Specifications (see Sec. 3);

    (ii) prior to Vendor's delivery of Products, production facilities involved in the manufacture of the Products will have been evaluated by an auditor whose report has been provided to WFMPL and, at all times during the production of Products, each manufacturer involved in its production will have operated its facilities and manufactured the Products in compliance with all Applicable Laws, current Good Manufacturing Practices ("**cGMP**") as defined by the U.S. Food and Drug Administration (the "**FDA**");

    (iii) if a Product is labeled organic, it will have been produced and handled in accordance with the National Organic Program standards and any applicable state or local requirements, all parties required by law to be certified will have been certified by a third party organic certifying agent recognized by the U. S. Department of Agriculture (the "**USDA**"), and all such parties will have complied with all applicable requirements of the certifying agent and the USDA; and

    (iv) upon payment, the Authorized Purchaser will own the Product shipment free of any security interest, lien, pledge or other encumbrance of any nature.

    (b) The representations, warranties and covenants made by Vendor in this Agreement will survive the acceptance, payment for and subsequent sale of a Product by the Authorized Purchaser and the expiration or termination of this Agreement. Vendor makes no representation or warranty with respect to any WFM Trademarks (see Sec. 10).

    (c) The term "**Applicable Laws**" includes all material requirements of any applicable domestic or foreign federal, state, provincial or local law, regulation or ordinance of the place where Products are produced and packaged and the laws of the place where Products are sold including pure food and drug laws, health and safety laws, recycling and other environmental laws, laws requiring notice to consumers of the country of origin and record keeping and the regulations and ordinances relating to those laws.

3.  <u>Product Specifications</u>. Vendor has reviewed WFM's quality standards, acceptable/unacceptable ingredient list and other specifications provided on the vendor pages of WFM's website www.wholefoodsmarket.com/vendor (the "**WFM Website**") (username: vendor, password: wholefoods) and any other Product specifications WFMPL has provided to Vendor in writing (collectively, "**WFM Requirements**"). Vendor represents and warrants that it has provided or will provide WFMPL with complete specifications (including technical and trade specifications) for Products including a list of all ingredients. Prior to first production or promptly after execution of this Agreement, final Product specifications for each Product will be provided by Vendor and recorded in a Whole Foods Market Private Label Technical Specification which Vendor will review for accuracy (the "**Technical Specification**"). The Technical Specification, the Approved Packaging Design (see Sec. 4) together with any product or

packaging specifications on Exhibit A are referred to in this Agreement as the "Product Specifications" and are hereby incorporated into this Agreement by reference and will be considered part of it upon creation and approval by Vendor. Vendor will provide WFMPL with at least 90 days advance written notice of any proposed change in any Product Specification including but not limited to any ingredient change or change in production facilities. No proposed change will be deemed accepted by WFMPL unless WFMPL has agreed to the change in writing. If all or any material part of a Product is manufactured by a third party, Vendor will not change suppliers without the prior written approval of WFMPL. If Vendor makes any such change without obtaining WFMPL written consent, Vendor agrees, at the request of WFMPL, to reimburse any amount paid by Authorized Purchasers for the affected Product units. The shelf life at time of manufacture for the Products is provided on Exhibit A. (the "**Initial Shelf Life**"). At the time of delivery of a Product shipment to the Delivery Point, all Products included in the shipment will have a remaining shelf life that equals or exceeds 80% of their Initial Shelf Life. Vendor will maintain appropriate documentation evidencing compliance with all Product Specifications. If a Product is labeled organic, kosher or non-GMO or includes any other certification mark on its packaging, Vendor will provide WFMPL with a copy of a current certificate of compliance from the third party certifier and any updates thereto. Vendor agrees to promptly notify WFM in writing if Vendor has reason to believe that any Product may fail to comply with any Product Specification, any Applicable Law or this Agreement.

4. Packaging. For new Products, prior to the design stage, Vendor will deliver to WFMPL final Product samples and information relevant to labels including a nutrition panel that complies with all Applicable Laws. Vendor will obtain (at Vendor's expense) an analysis of Product samples from a third party lab acceptable to WFMPL and provide WFMPL with a report from the lab confirming label claims. Vendor will be solely responsible for confirming that labels and packaging are correct and in compliance with all Applicable Laws and will pay all Applicable Expenses or other additional costs resulting from errors in information provided by Vendor. Vendor agrees to review label art files and notify WFMPL of any errors. For all new, reformulated or rebranded Products, Vendor will pay for printing plates, prepress, labels, films and packaging. Vendor will not order, produce or purchase labels or packaging or pack any Product until WFMPL has approved both (i) final Product samples and (ii) final packaging and labels (the "**Approved Packaging Design**") and Vendor has received written approval from WFMPL to proceed. Vendor agrees to notify WFMPL in writing prior to every label print or reprint. Vendor will not change (or authorize any printer to change) any art files without WFMPL's prior written approval. In addition to other remedies available to WFMPL, WFMPL will not be required to use or reimburse Vendor pursuant to Section 9 or otherwise for any labels that have been altered without WFMPL's written approval. For all new items and in connection with any printer change, Vendor agrees to submit printer proofs prior to printing. WFM or the Authorized Purchaser may reject or return any Product shipment or WFMPL may elect to correct the packaging if Product packaging is not consistent with the Approved Packaging Design (including font, color and quality), if labels fail to comply with any Applicable Law or if Products include any unauthorized use of third party intellectual property. If WFMPL elects to correct the packaging, Vendor agrees to promptly reimburse WFMPL for all reasonable costs incurred by WFM. If Vendor provides any original works of authorship used in connection with any Product packaging, Vendor hereby assigns all rights in such works to WFM. Vendor is responsible for notifying WFMPL of any new or revised law or regulation that affects packaging and for all costs associated with updating packaging to comply with new laws and regulations.

5. Quality Assurance.

(a) Quality Assurance Program. WFM has a quality assurance program that evaluates factors such as production facility audit scores, customer complaints, quality issues, product testing, prior withdrawals and recalls and inherent risks associated with products. Vendor's compliance with WFM's quality assurance program is a condition to WFM's obligations under this Agreement.

(b) Facility Audits. As part of its quality assurance program, WFM will require Vendor to provide WFM with the results of an independent audit of Product production facilities performed by a qualified third party auditor acceptable to WFM at least once a year. Additional audits may be required by WFM based upon WFM's quality assurance evaluation. All audits will be at Vendor's expense.

(c) Product Sample Tests. Vendor agrees to submit Product samples for each Product SKU to an independent third party laboratory designated by WFM for testing ("**Product Tests**"). Product Tests will be performed on the first production run and periodically thereafter in accordance with the testing requirements identified in the Product's Technical Specification. In addition, if a WFM customer claims that a Product caused an allergic reaction or illness, contained a foreign object or was otherwise defective, or if any government agency requests Product testing, Vendor agrees to test Vendor's retained samples. Product Tests will be at Vendor's expense. Vendor agrees to notify WFMPL promptly if any Product Test indicates the Product may not comply with Product Specifications, this Agreement or any Applicable Law and to provide the results of all Product Tests to WFM at WFM's request (including internal Product Tests). Product testing requirements may be modified by WFM at any time upon 30 days notice to Vendor.

(d) WFM Inspections. Vendor grants WFM and its agents the right to do the following at WFM's expense: (i) to inspect all manufacturing and storage facilities relating to Products during regular business hours; (ii) to have a

2

representative on-site during any production run; and (iii) to randomly test Products during any production run, in storage or after delivery at WFM's expense. If any sample test results indicate that a Product sample does not comply in any material respect with the requirements of this Agreement, Vendor will pay for additional tests reasonably requested by WFM.

6. Customer Relations; Withdrawals & Recalls.

(a) Vendor will provide WFMPL with contact numbers where WFMPL may reach Vendor outside of normal business hours. Vendor has and will maintain a reliable recall system including appropriate tracking, coding and accounting systems for all Products and will retain and appropriately store Product samples from each lot or batch of Product until the end of the sample's stated shelf life. WFM will have the sole right to manage customer relations. Vendor will not contact WFM's customers without WFM's consent and will instruct any customer who contacts Vendor to contact WFM. Vendor will consult directly with WFM's Exclusive Brands Team for instructions relating to quality issues, including withdrawals and recalls.

(b) Vendor agrees to pay all reasonable expenses, including Applicable Expenses, associated with the withdrawal or recall of a Product or safety notice including reimbursement for the Product if the withdrawal, recall or safety notice is based upon sample tests or other credible evidence indicating that all or part of one or more Product shipments, as a result of a condition that existed at the time of delivery to the Delivery Point, fails to comply with any Applicable Law or any of the representations, warranties or covenants made by Vendor in this Agreement, or could otherwise pose a health or safety risk. In addition, WFM may withdraw or recall any Product for any reason at WFM's own expense without liability or obligation to Vendor. At WFMPL's request, Vendor will cooperate with and assist WFMPL with withdrawals, recalls and safety notices. WFMPL will have the option of initiating any recall as a Whole Foods Market recall, however, if requested by WFMPL, Vendor agrees to initiate and manage the recall and issue the appropriate press releases under Vendor's own name.

7. Price, Payment and Delivery.

(a) No price increase will become effective unless Vendor has provided WFMPL with at least 90 days written notice of the proposed new price and evidence that a change in the price of a commodity used in the manufacture of the Product has resulted in a material change in the cost of producing the Product. If WFMPL rejects any proposed price increase and discontinues the Product, Vendor will continue to sell Products to Authorized Purchasers at the previous price for 90 days. Notwithstanding the foregoing, Vendor agrees to sell new Products at the initially agreed upon price to Authorized Purchasers from the date of the first shipment for one year. The agreed upon prices will apply to sales of Product by Vendor to all Authorized Purchasers. Vendor will notify WFM if any Authorized Purchaser requests Vendor to charge a price different from the price agreed upon by WFMPL and Vendor or to provide the Authorized Purchaser with a discount, offset, or any financial benefit or payment.

(b) Vendor will not accept Purchaser Orders for or ship any new Product until Vendor has received written notice from WFMPL stating that WFMPL has inspected and approved samples from the Product's first production run. WFMPL may reject Products and reject any Product SKU if WFMPL reasonably believes that first production run samples are not consistent with Product test samples initially approved by WFMPL or if Products fail to comply with Product Specifications.

(c) Vendor will only accept Purchase Orders for Products from and will only sell Products to Authorized Purchasers. Vendor will deliver Products in strict compliance with the terms of this Agreement and the Purchase Order appropriately packed for reshipment (unless delivered directly to a store). Vendor's delivery of Product shipments will occur and title and risk of loss will pass when a Product shipment is delivered to the "Ship To" address in the Purchase Order (the "Delivery Point") and a representative of an Authorized Purchaser has signed the bill of lading or other shipping document acknowledging its receipt. Vendor will comply with all reasonable policies and requirements of Authorized Purchasers including policies relating to purchase orders, deliveries, appointments, invoices, bills of lading and pallet requirements. Vendor will promptly notify Authorized Purchasers and a WFMPL Business Manager of any Product shortages, decreased availability or out of stocks.

(d) For Products sold by Vendor to an Authorized Purchaser that is a third party distributor, the payment terms which apply will be those that have been agreed upon by Vendor and the third party distributor. Authorized Purchasers are solely responsible for paying their invoices. WFM will not be responsible for the acts or omissions of any third party distributor including the failure of any third party distributor or consolidator to pay an invoice. Payment terms for any Product shipments purchased by Authorized Purchasers that are WFM stores or distribution centers are noted on Exhibit A. All amounts quoted will be in US dollars. The Products are being purchased for resale. Vendor's pricing will not include sales, use or other similar taxes. Vendor is responsible for and agrees to pay all taxes and charges relating to the manufacture, sale, shipment and delivery of Products to the Delivery Point. Vendor will not bill for and the purchaser will not be required to pay any such charges (including pallets charges). Payment of any amounts owed by Vendor to WFM will be due within 30 days of Vendor's receipt of the applicable notice or invoice. WFM may deduct or offset amounts owed by Vendor to WFM from any amount owed by WFM to Vendor.

8. Nonconforming Products. In addition to any other remedies WFM or any Authorized Purchaser may have,

3

WFMPL or the Authorized Purchaser may terminate any outstanding Purchase Order for Products and, at their option, reject, revoke acceptance of and either destroy, donate, hold or return Product shipments at Vendor's expense if (i) any Product Test or other credible evidence indicates that samples from the same Product SKU are adulterated, mislabeled, or otherwise fail to comply with Product Specifications (including shelf life), this Agreement, any Applicable Law or the Purchase Order, (ii) conditions exist at any of the applicable production facilities that create a substantial risk that units of the Product could be contaminated or are defective, or (iii) Vendor has failed to comply with any of the representations, warranties or agreements made by Vendor in this Agreement. Payment of an invoice will not waive these rights. Vendor agrees to reimburse the Authorized Purchaser for non-conforming Products and pay all reasonable expenses incurred by WFM or the Authorized Purchaser as a result of the non-conforming Products or Vendor's breach of this Agreement including but not limited to costs and expenses relating to inspections, testing and Product analysis, labor (including store, distribution center and administrative personnel), publishing notices, storing, packaging, handling, transporting, re-labeling and/or destroying the Product (and any products with which the Product has been commingled), taxes, tariffs, fees, fines or penalties imposed upon WFM or an Authorized Purchaser, expedited shipping for replacement product, refunds or settlement amounts paid to customers and WFM's cost of unsold Products ("**Applicable Expenses**"). If the non-conformance is due to labels or packaging and WFMPL elects to correct the label or packaging, Vendor agrees that Applicable Expenses payable by Vendor will include the cost of relabeling the Products. If Vendor fails to promptly pick up non-conforming Products that are being returned by an Authorized Purchaser Vendor agrees that Applicable Expenses payable by Vendor will include reasonable warehousing fees.

9. Discontinued Product Reimbursements. If WFMPL discontinues a Product or elects to change a Product's packaging or label WFMPL will give Vendor notice by email or other written means. WFMPL may discontinue or rebrand any Product for any reason at any time. If WFMPL without cause discontinues or rebrands a Product after WFMPL has approved samples from the Product's first production run, Authorized Purchasers and/or WFMPL during the regular course of business for the next 90 days will purchase up to a 90 day supply of finished goods inventory on hand if the finished goods inventory is in compliance with this Agreement. If Vendor together with its distributors have less than 90 days of finished goods inventory on hand, WFMPL will also purchase packaging and labels inventory that includes WFM Trademarks as long as (i) finished goods and packaging/labels together do not exceed a 90 day supply, (ii) the unused labels inventory was produced after Vendor's receipt of written approval from WFMPL to proceed with the packaging/print run and did not exceed the number of labels approved, and (iii) Vendor provides WFMPL with a purchase order (with pricing) associated with Vendor's purchase of the applicable packaging/labels. If, in satisfaction of this obligation, WFMPL asks Vendor to transfer packaging materials to a third party or to WFM, Vendor will sell the labels and other materials at a price equal to Vendor's actual cost. Vendor agrees that it will have any remaining materials that include WFM Trademarks destroyed and will provide a sworn statement of confirmation to WFMPL. A 90 day supply of finished goods and packaging will be based upon the historical retail sales volumes for the Product at WFM stores or, for Products with less than 90 days of sales history, it may be based upon a forecast or estimate provided by WFMPL to Vendor. Any purchases by Authorized Purchasers of finished goods after Vendor's receipt of a notice of discontinuance of a Product or notice of termination of this Agreement will count toward the satisfaction of WFMPL's obligation set forth in this Section. This Section does not apply to seasonal or holiday Products or Products otherwise designated for sale during a limited time period or to Products that have been ordered in an agreed upon set quantity. Neither WFMPL nor any Authorized Purchaser will be required to purchase or reimburse Vendor for any Product inventory or packaging associated with a Product if Product Tests or other credible evidence indicates that samples of the Product do not comply with this Agreement or any Applicable Law or Vendor has failed to comply with this Agreement.

10. Work Product & Intellectual Property.

(a) Any designs, graphics, labels, sketches, marketing materials, promotional materials, and displays relating to the Products or used on Products that have been prepared, developed or created by or on behalf of WFM, or by Vendor, or by any of their respective personnel, agents or contractors, will be owned by Whole Foods Market IP, L.P. ("**WFMIP**") and will be referred to herein as WFM Work Product. Vendor hereby assigns to WFMIP without limitation or additional compensation to Vendor, all right, title and interest, including the copyrights and other intellectual property rights embodied in the WFM Work Product. Vendor agrees to provide WFMIP with all documents requested by WFM for documenting or recording the assignment.

(b) Vendor acknowledges that (a) the trademarks, trade names, service marks, slogans, designs, distinctive advertising, labels, logos, and other trade-identifying symbols and devices that are or have been developed and used by WFM or any of its affiliates (the "**WFM Trademarks**") and (b) any cosmetic designs, ornamental appearance or trade dress embodied in or relating to any Products (the "**WFM Trade Dress**") constitute valuable intellectual property which, as between WFM and Vendor, are owned solely and exclusively by WFMIP. During the term of this Agreement only, Vendor shall have a non-exclusive, limited license to use the WFM Trademarks and/or the WFM Trade Dress as directed by WFM for the sole purpose of affixing the WFM Trademarks or incorporating the WFM Trade Dress into Products supplied to Authorized Purchasers pursuant to this Agreement.

4

(c) Vendor will not use WFM's name, the WFM Trademarks, the WFM Trade Dress, the WFM Work Product and/or any copyrights, domain names, trade secrets or other intellectual property of WFMIP or its affiliates (collectively, the "**WFM Intellectual Property**") except as provided in this Agreement. All uses by Vendor of WFM Trademarks will inure to WFMIP's sole benefit. Vendor agrees never to impugn or challenge, or to assist in any challenge of the validity of any WFM Intellectual Property, any registration (or application for registration) of any WFM Intellectual Property, or WFMIP's ownership of any WFM Intellectual Property or to apply to register any WFM Trademark, or any mark confusingly similar to a WFM Trademark in any domestic or foreign jurisdiction. Vendor will not take any action which would tend to destroy or diminish the goodwill associated with WFM or any WFM Trademark. WFM makes no representation or warranty that the WFM Trademarks are valid or validly registered.

(d) <u>Vendor will not donate, sell or authorize anyone else to donate or sell any Product or Product packaging or label or any other item that includes any WFM Intellectual Property other than to Authorized Purchasers unless Vendor has obtained WFM's prior written approval. If Vendor has discontinued, withdrawn or leftover Products or Product packaging and WFM authorizes Vendor to sell or donate those items, Vendor will remove all WFM Trademarks from them. If for any reason any item containing WFM Intellectual Property is donated or sold by Vendor or by any third party manufacturer, shipper, consolidator or distributor to anyone other than an Authorized Purchaser without WFM's written approval, in addition to any other remedies available to WFM, Vendor agrees, at WFM's option, to either (i) recover the items and destroy them or (ii) reimburse WFM for all reasonable expenses incurred by WFM in connection with recovering and destroying the items.</u>

(e) Vendor acknowledges that because the Products are being sold under WFM's private labels, WFM has an interest in maintaining the confidentiality of the source of the Products. The parties agree that the fact that Vendor is the supplier of the Products is WFM's Confidential Information. <u>Unless previously approved in writing by WFM, Vendor will not (i) display any Product bearing a WFM Trademark in any trade show, on any web page or otherwise, (ii) disclose the fact that Vendor manufactures the Products, or (iii) mention WFM by name in any oral or written statement to the press or the public, on any web site or in any publication. Nothing in this Agreement or otherwise, however, will prevent WFM from disclosing the fact that Vendor is the supplier of the Products.</u>

(f) Upon demand by WFM, Vendor will immediately stop using all WFM Intellectual Property. Nothing in this Agreement will be construed to bar WFM from protecting its rights to the exclusive ownership of the WFM Intellectual Property.

11.     Indemnification.

(a) Vendor agrees to indemnify and hold harmless and defend WFM and Vendor hereby releases WFM from and against any and all Losses (defined below) caused in whole or in part by or arising from (i) Vendor's breach or alleged breach of any representation, warranty, covenant or other obligation of Vendor set forth in this Agreement, (ii) the negligence, recklessness or willful misconduct of Vendor, any affiliate of Vendor or any third party involved in the production or distribution of the Product to the Delivery Point, (iii) the presence or activities of Vendor or any of its agents at any WFM premises, (iv) the failure or alleged failure of a Product to comply with any claim or representation on its label or the failure or alleged failure of a Product label to disclose information about the Product, (v) any claim relating to a Product brought pursuant to California's Safe Drinking Water and Toxic Enforcement Act of 1986 (Proposition 65), (vi) any third party claim or complaint about a Product initiated because of or resulting from the condition of a Product which existed prior to the acceptance of the Product shipment at the Delivery Point by an Authorized Purchaser, (vii) any Product recall, withdrawal or safety notice initiated because of or resulting from the condition of a Product which existed prior to the acceptance of the Product shipment at the Delivery Point by an Authorized Purchaser, (viii) any claim that a Product (or the use thereof whether alone or in combination with any other product or service) infringes upon or constitutes an unauthorized use of any patent, copyright, trademark, service mark, trade dress, trade secret or other intellectual property right (collectively "**Intellectual Property**") (excluding claims based upon WFM Trademarks), (ix) the termination by any kosher or organic certifying agent of authorization to use their certifying mark, or (x) any unauthorized use of WFM Intellectual Property by Vendor or any third party retained by Vendor in connection with supplying the Products. If the root cause of an adulteration discovered after delivery of a Product shipment to the Delivery Point is a result of the production, processing or packing of the Products prior to delivery or the condition of the container at the time of delivery, then the adulteration will be regarded as having existed prior to the time of the acceptance of the Product shipment.

(b) WFM agrees to indemnify and hold harmless and defend Vendor and WFM hereby releases Vendor from and against any and all Losses caused in whole or in part by or arising from (i) the breach or alleged breach of any representation, warranty, covenant or other obligation of WFM set forth in this Agreement; (ii) the negligence, recklessness or willful misconduct of WFM; and (iii) any claim that any WFM Trademark infringes upon third party rights.

(c) The obligation to indemnify includes an obligation to indemnify the respective party and all its direct and indirect affiliates, parents, and subsidiaries and related entities, and each of their shareholders, members, managers, partners and other owners, their officers, directors, employees, agents, and other representatives and, for purposes of Section 11(a), WFM's designated third party distributors (in each case, an "**Indemnitee**"). The term "<u>Losses</u>" means losses suffered by an

5

Indemnitee and all claims against an Indemnitee for losses including but not limited to those relating to bodily injury, personal injury, illness, death, property damage or loss (including real and personal property whether owned or leased), Applicable Expenses, damages, liabilities, demands, liens, encumbrances, causes of action, obligations, costs (including reasonable attorneys fees, court costs and other costs of defense), judgments, fines, fees, interest, awards or settlement amounts (whether created by law, contract, tort, strict liability, voluntary settlement, or otherwise), and all claims that might be brought by (or losses suffered by) spouses, heirs, survivors or legal representatives, successors and assigns.

(d) Each party will provide the other with notice of a claim or threat of Loss or of a Loss suffered for which indemnification from the other party may be sought. WFM will have the right to investigate and negotiate a settlement of customer complaints and of selecting counsel and controlling the defense of third party claims unless Vendor notifies WFMPL that its insurance provider has accepted the claim in which case WFMPL shall have the right to approve choice of counsel and to participate in the investigation, settlement and defense. Vendor will be responsible for paying WFM's reasonable expenses as they are incurred including but not limited to reasonable attorneys' fees and expenses and court costs associated with investigating and settling or litigating claims if the claim is subject to indemnification under Section 11(a). If Vendor's insurance provider is handling the defense, WFM may employ additional counsel to assist WFM. Notwithstanding the foregoing, such additional counsel shall be at WFM's expense unless there is a conflict of interest between WFM and Vendor or WFM and Vendor's counsel in which case Vendor shall bear the expense of the additional counsel.

12. **Additional Representations, Warranties and Covenants.** Vendor represents, warrants and agrees as follows: (a) its performance of this Agreement will not violate any agreement between Vendor and any third party; (b) Vendor and all third parties involved in the production and delivery of the Product will maintain all licenses and registrations and pay all fees required by federal, state or local law to operate their businesses, produce the Products and qualify Products for sale in WFM stores; (c) if it has reason to believe that any Product may not comply with this Agreement or may pose a health or safety risk, it will promptly notify WFM in writing; (d) it will maintain documentation evidencing compliance with all Product Specifications and this Agreement, including evidence that no food or ingredient in any Product was produced using genetically engineered seed stock or was otherwise created through genetic engineering; (e) it will promptly provide WFMPL with information or documentation reasonably requested by WFMPL concerning Products including requests made by WFM for purposes of confirming quality assurance, responding to complaints and complying with Applicable Laws; and (f) Vendor is aware of the requirements of California's Safe Drinking Water and Toxic Enforcement Act of 1986, Health and Safety Code Section 25249.5 et seq, commonly known as "Proposition 65" and is and will remain in compliance with its requirements.

13. **Insurance.**

(a) Without limiting Vendor's other obligations under this Agreement including its obligation to indemnify WFM, Vendor will maintain the following insurance coverage (the "**Insurance Coverage**") during the term of this Agreement and for the following 12 months to protect Vendor from claims that arise out of or result from Vendor's performance of this Agreement including the performance by Vendor's agents or by anyone else for whose acts Vendor may be liable:

(i) Commercial General Liability Insurance with a combined single limit of at least $1,000,000 per occurrence and $2,000,000 general aggregate and $2,000,000 product/completed operations aggregate, including coverage for bodily injury (including wrongful death), broad form property damage for all premises and operations, independent contractors and broad form contractual liability;

(ii) Umbrella or Excess Liability Insurance with limits not less than $5,000,000 per occurrence which provides additional limits for general liability and products liability, including ongoing and completed operations.

(iii) Automobile Liability Insurance with a combined single limit of at least $1,000,000 per occurrence for injuries, including accidental death and property damage; and

(iv) Workers Compensation and Employers Liability insurance that complies with the laws of each jurisdiction in which any portion of the work is performed and, with respect to Employer's Liability, provides benefits for employees with coverage of at least $1,000,000 for each accident or disease.

(b) Vendor or the Insurance Coverage will comply with the following terms: (i) the Insurance Coverage will be written by insurers in good standing that are licensed and admitted to do business in the locations where the Products are to be sold; (ii) the Insurance Coverage will be written on an occurrence basis by insurers that have policy ratings no lower than "A-" and financial ratings not lower than "Class XII" in the Best's Insurance Guide, latest edition in effect; and (iii) the aggregate annual deductible on any policy will not be greater than $50,000.00.

(c) Vendor represents, warrants and covenants that the Insurance Coverage will meet the following requirements and, upon execution of this Agreement, Vendor will supply WFMPL with a Certificate of Insurance with an attached Endorsement on Form CG 20 15 or its equivalent confirming that the following are true: (i) that all of the Insurance Coverage is in force, (ii) that the insurer will endeavor to give WFMPL not less than 30 calendar days' written notice prior to any cancellation, non-renewal or restrictive modification of the Insurance Coverage,

6

(iii) that the Insurance Coverage contains or is endorsed to contain provisions designating Whole Foods Market, Inc., and its affiliates as additional insureds on all policies (other than Workers' Compensation) on a primary and noncontributory basis and that the insurers have waived all right of subrogation against such parties; (iv) that the Insurance Coverage includes coverage for suits between or among insureds; and (v) that any self-insurance, self-retained layer, deductibles, or exclusions will be assumed by Vendor. The Certificate of Insurance will identify all policy exclusions applicable to the Insurance Coverage and any Self Insured Retention. At the request of WFM, Vendor will provide a certified copy of each required policy. Vendor will require all of Vendor's subcontractors to be insured against claims arising out of or relating to their performance of any of Vendor's duties under this Agreement.

(d) Vendor's liability to WFM under this Agreement will not be limited to the extent of the minimum limits of insurance required above or by a limitation on the amount or type of damages or benefits payable by Vendor or its insurer to an employee under employee benefit acts. The maintenance of the Insurance Coverage is a condition precedent to Vendor's exercise or enforcement of any rights under this Agreement or any Purchase Order.

14. Term. This Agreement will remain in effect for one year after the Effective Date unless terminated as provided below. This Agreement will automatically renew at the end of the one year period for an additional year and every year thereafter unless one party provides the other party with 90 days or more written notice prior to the expiration of the then current term. Notwithstanding the foregoing, WFMPL may terminate this Agreement at any time for any reason during the initial term or any renewal term by providing Vendor with written notice of termination and complying with the terms of Section 9 with respect to the reimbursement of inventory. Termination by WFMPL or discontinuance of a Product after repeated out of stocks, failure to fill purchase orders or breach by Vendor of the Agreement will be deemed termination for cause. In all cases, Sections 2 and 6-17 will survive this Agreement's termination or expiration.

15. Confidentiality. In connection with the negotiation or performance of this Agreement or prior business dealings between the parties, Vendor may have acquired or may acquire non-public information relating to WFM such as business methods, practices or goals, product details, trends, sales data, forecasts, intellectual property, purchasing history, product prices, marketing strategies, product specifications, research and customer information ("**Confidential Information**"). Vendor agrees that it will not disclose Confidential Information to any third party unless the disclosure is necessary to fulfill Vendor's obligations under this Agreement and the third party has agreed to keep the information confidential. Vendor will use the degree of care it uses to protect its own confidential information to maintain the confidentiality of all WFM Confidential Information but in no case less than reasonable care. Vendor agrees to use Confidential Information only for the purpose of fulfilling its obligations under this Agreement. Vendor will return all Confidential Information within five days after receipt of a written request.

16. Law; Forum and Jurisdiction; Waiver. **The relationship of the parties hereto and all claims arising out of or related to that relationship, including, but not limited to, the construction and interpretation of this Agreement, will be governed by the <u>substantive laws of the State of Texas</u>. The parties consent to venue in and the jurisdiction of the courts located in Austin, Travis County, Texas and acknowledge that they are proper and convenient forums. This is not an exclusive forum selection clause, however, to the fullest extent permitted by law, if an action is filed in the appropriate court in Austin, Travis County, Texas the parties waive any right to object to jurisdiction or venue in such court and waive any right to a jury trial.** The prevailing party in any action to enforce this Agreement will be entitled to recover all costs of the suit, including reasonable attorneys' fees and court costs. The parties waive all rights to punitive damages. Vendor acknowledges that both WFM Confidential Information and WFM Intellectual Property possess a unique character that makes it difficult to assess the monetary damage WFM would sustain in the event of its unauthorized use. Vendor acknowledges that irreparable injury would be caused to WFM, there would be no adequate remedy at law, and a temporary restraining order or injunctive relief would be appropriate. Vendor waives any right it may have to require WFM to post a bond in connection with any such order.

17. Miscellaneous. Nothing contained in this Agreement will create a partnership, joint venture, employer-employee or other similar relationship. Neither party is authorized to contract or act in the name of or on behalf of the other party. This Agreement supersedes all prior oral and written agreements between Vendor and WFMPL or any of its affiliates but only to the extent the oral or written agreement applies to private label products. This Agreement does not supersede affidavits and Product specifications provided by Vendor to WFM including trade and technical specifications all of which are incorporated herein by reference. All exhibits and attachments are incorporated by reference. This Agreement may be executed in multiple counterparts. Any signature delivered by email or facsimile will be treated as an original. This Agreement is binding upon and inures to the benefit of the parties, their legal representatives and permitted successors and assigns. The terms in this Agreement and in the applicable Purchase Order will prevail over any Vendor or third party document including the terms in any Vendor invoice, order acknowledgement or confirmation. The terms in this Agreement may not be modified or waived except in writing signed by both parties. A waiver of any provision of the Agreement by a party will only apply to the occurrence involved. It will not be construed as a continuing waiver. Failure or delay to enforce this Agreement will not be construed as a waiver. Except to the extent otherwise provided, this

7

Agreement does not create rights or benefits in favor of any party other than WFM and Vendor. Vendor will notify WFMPL in writing prior to any transaction involving the sale of all or substantially all of Vendor's assets or change of 50% or more of its ownership. Vendor will not assign this Agreement without obtaining WFMPL's written consent. Nothing in this Agreement prevents WFM from purchasing the same or similar products from a third party. Vendor agrees to use reasonable commercial efforts to mitigate damages resulting from any cancelled Purchase Order or discontinued Product. Unless otherwise stated, all notices given in connection with this Agreement will be in writing. A notice will be deemed to have been delivered when actually received by the party to whom it was sent. If sent by email, a return email from the recipient responding to the original email will be evidence of delivery. In addition, a notice will be deemed to have been delivered at the following times if delivered as follows: (i) at the time of personal delivery, (ii) 3 business days if mailed by certified mail, (iii) at the time guaranteed by courier if sent by a recognized national or international courier (in all cases postage prepaid and return receipt requested) to Vendor at the address provided below and to WFM at 550 Bowie Street, Austin, Texas 78703, Attention: Director of Exclusive Brands. If any term of this Agreement is unenforceable, it will be severed from the Agreement, and the remainder of this Agreement will be enforced. Headings will not affect the construction of this Agreement. Every provision of this Agreement will be construed according to its fair meaning and not strictly for or against either party. Time is of the essence in the performance of this Agreement and Purchase Orders. During the performance of this Agreement and for two years thereafter, Vendor will keep records relating to the production of the Products. Upon 7 days notice, Vendor will provide WFM with access to records (including electronic records) for inspection and copying during Vendor's working hours.

The parties have entered into this Agreement to be effective as of the Effective Date noted at the beginning of the Agreement.

**WFM PRIVATE LABEL, L.P.,**
**a Delaware limited partnership**

By:   WFM PRIVATE LABEL MANAGEMENT, INC.,
      a Delaware corporation, its General Partner

By: _____
     Jim Speirs, Vice President

Date: 5/4/10

Date: May 13th 2010

Portion to Be Filed Under Seal Pursuant to Order, Dkt. No. 89

8

# EXHIBIT A
## PRODUCT LIST AND ADDITIONAL TERMS



### ADDITIONAL TERMS

The following terms are in addition to the terms in the main body of this Agreement. There are no other changes to the terms in the Agreement except those noted in this Exhibit A.

1. If any Products shipments are purchased directly by WFM stores or distribution centers, payment terms will be ▓▓▓▓▓▓▓▓▓.

WFM PRIVATE LABEL, L.P.,
a Delaware limited partnership

By:   WFM PRIVATE LABEL MANAGEMENT, INC.,
      a Delaware corporation, its General Partner

By: _____[signature]_____
    Jim Speirs, Vice President

Date: 5/14/10

Date: May 13 2010

Portion to Be Filed Under Seal Pursuant to Order, Dkt. No. 89

HIGHLY CONFIDENTIAL INFORMATION: SUBJECT TO PROTECTIVE ORDER

WFM00101